Markman, J.
We granted leave to appeal to consider whether the trial court erred by admitting defendant’s confession to a parole officer. The Court of Appeals held that the admission of defendant’s confession violated Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), and Edwards v Arizona, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981), because Evans was a “law enforcement officer” for purposes of Miranda. We respectfully disagree because this is not a sufficient condition for the application of these decisions. Even if every parole officer constitutes a “law enforcement officer,” neither an accused’s right under Miranda to be given a series of warnings nor an accused’s right under Edwards to have counsel present apply absent “custodial interrogation” by the officer. Because defendant was not subjected to “custodial interrogation” by the parole officer as that term has come to be understood under Miranda and its progeny, neither defendant’s Miranda nor defendant’s Edwards rights were violated, *296 regardless of whether the parole officer was a law enforcement officer. Thus, the trial court did not err by admitting defendant’s confession. By focusing on the wrong constitutional question, the Court of Appeals considerably expanded the domain of Miranda, particularly with regard to parole officers. Accordingly, we reverse the judgment of the Court of Appeals and reinstate defendant’s conviction and sentence.
I. FACTS AND HISTORY
In 2006, defendant was convicted of unarmed robbery in violation of MCL 750.530, and the trial court sentenced him to serve a prison term of 3 to 15 years.[1] In February 2010, at the discretion of the parole board, defendant was granted parole and provisionally released from prison. Upon release, defendant was placed under the supervision of a parole officer and required to abide by certain conditions of parole. These conditions included that defendant not engage in behavior that constitutes a violation of any federal, state, or local law, that he not use or possess controlled substances, and *297 that he follow the parole officer’s instructions and report as required by the officer.
On June 17, 2010, defendant was taken into custody by police pursuant to a warrant for failing to report, and the next day, his parole officer, Jason Golightly, served defendant with a notice of parole violation pertaining to that failure. On the same day, after advising defendant of his Miranda rights, detectives of the Jackson Police Department questioned defendant concerning a robbery that had occurred at approximately 4:00 a.m. on June 16, 2010, at a Jackson gas station. After voluntarily answering several questions, defendant requested an attorney. The police then discontinued the interrogation.
On June 21, 2010, while defendant was still incarcerated, his parole officer was on vacation, so another officer, Cheryl Evans, went to the jail to serve defendant with an amended notice of parole violation that identified three additional parole violations, one of which related to the June 16 robbery.[2] Evans testified as follows regarding what occurred at the jail:
Q. And what, exactly does [“serve him parole violation charges and get his statement”] mean? What do you do? What’s the process when that happens?
A. When a person is served with a parole violation charge, when we determine they - or we believe they have *298 violated a condition of their parole, we have charges made up. They’re on a piece of paper.
We then go and meet with the person. We serve them the charges, which means I say “Count I,” “Count II” - or, for him, it was Count - it was an additional count, so it was Count III, Count IN Count V And then I review it with him.
I ask him for a statement. We talk a little bit. And then he decides whether he signs the bottom - not saying he’s guilty - just signs that he received the charges.
Then he’s offered a preliminary parole violation hearing, which is a probable cause hearing. And, again, he waived that, but waiving that does not admit he’s guilty. It’s just that he’s waiving the preliminary hearing.
Q. So, did you do all this with the Defendant?
A. Yes.
Q. And did he give you a statement?
A. Yes, he did.
Q. Did one of the charges have to do with the robbery at the Admiral gas station?
A. Yes.
Q. Did he give you a statement as to those charges?
A. Yes.
Q. And what did he say?
A. We talked generally about everything that was going on and he said that he’d been having a rough time. He said that he was living with his cousin, Laurie Brooks, who has a couple of kids, and that he felt - he wasn’t able to get a job and hold a job - and he felt that he was putting a lot of financial stresses on her. And he also said, you know, he, himself, got a little stressed about it and was having a lot of trouble adjusting and he slipped and started using his cocaine again.
And he said he went into the Admiral gas station. He told me that he walked in there to the clerk, asked the clerk *299 for some cigarettes. The clerk turned around to get cigarettes. As the clerk turned around - he actually showed me what he did — he leaned forward like this onto the counter and told the guy in a low voice to — told him to give him the money and he wouldn’t get hurt, and then he said the guy gave him the money and he left.
Relevant here, the meeting between Evans and defendant took place in the jail library and lasted approximately 15 to 25 minutes. Evans did not inform defendant of his Miranda rights or tell defendant that he was not required to speak to her absent a lawyer being present. According to Evans, during the meeting, defendant told her that he had submitted a letter indicating that he wished to talk to the police again, and at the end of the meeting, defendant asked Evans to convey to the police that he wished to speak to them.
Defendant was eventually charged with armed robbery for the gas station incident, and he was tried before a jury. At the beginning of trial, defendant moved to suppress Evans’s testimony regarding defendant’s confession, arguing that it was improperly obtained because defendant had not been informed of his Miranda rights and because defendant had previously requested counsel. After conducting a hearing, the trial court determined that Evans had not been acting in concert with law enforcement officials and that Evans was not herself a law enforcement officer obligated to give Miranda warnings. Accordingly, the court denied defendant’s motion and admitted Evans’s testimony regarding defendant’s confession. The jury convicted defendant of armed robbery, and he was sentenced as a fourth-offense habitual offender to a prison term of 15-30 years.
Defendant appealed, arguing that the trial court had erred when it denied his motion to suppress Evans’s testimony regarding his confession and that the error *300 was not harmless. In a published opinion, the Court of Appeals held that a parole officer is a law enforcement officer for purposes of Miranda, that defendant was in custody when Evans interrogated him, and that the statements made by defendant were thus “inadmissible in a subsequent trial [because] the parolee invoked the right to counsel before questioning.” People v Elliott, 295 Mich App 623, 646; 815 NW2d 575 (2012). The Court of Appeals agreed with defendant that the trial court’s error in denying the motion to suppress was not harmless given the significance the prosecutor had placed on Evans’s testimony. Id. at 647-648. The Court of Appeals reversed defendant’s conviction and remanded for a new trial. Id. at 626. We granted the prosecutor’s application for leave to appeal. People v Elliott, 491 Mich 938 (2012).[3]
II. STANDARD OF REVIEW
“We review a trial court’s factual findings in a ruling on a motion to suppress for clear error. To the extent that a trial court’s ruling on a motion to suppress *301 involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo.” People v Attebury, 463 Mich 662, 668; 624 NW2d 912 (2001). Whether a court applied the correct constitutional standard is reviewed de novo. People v McRae, 469 Mich 704, 710; 678 NW2d 425 (2004).
III. ANALYSIS
In Miranda, the United States Supreme Court held that the Fifth Amendment’s prohibition against compelled self-incrimination requires that the accused be given a series of warnings before being subjected to “custodial interrogation.”[4] Miranda, 384 US at 444 (“Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.”). The right to have counsel present during custodial interrogation is a corollary of the right against compelled self-incrimination, because the presence of counsel at custodial interrogation is one way in which to “insure that statements made in the government-established atmosphere are not the product of compulsion.” Id. at 466; see also id. at 470. If the custodial interrogation is not preceded by an adequate warning, statements made during the custodial interrogation may not be introduced into evidence at the accused’s criminal trial. Id. at 444-445.
*302 The prosecutor concedes that Miranda warnings were not given by the parole officer. Thus, the pertinent question is whether the meeting with the parole officer that resulted in defendant’s inculpatory statements constituted custodial interrogation. If the meeting did not constitute custodial interrogation, the ruling of the trial court was correct and the statements were properly admitted into evidence. See People v Hill, 429 Mich 382, 397; 415 NW2d 193 (1987) (indicating that Miranda warnings are not required unless the accused is subject to custodial interrogation). On the other hand, if the meeting did constitute custodial interrogation, the ruling of the trial court was in error and the statements were improperly admitted into evidence.
There is no dispute that defendant invoked his right to have counsel present during custodial interrogation when he was questioned on June 18 by Jackson police detectives about the gas station robbery and that the invocation triggered certain safeguards pursuant to Edwards, 451 US at 484-485. In Edwards, the United States Supreme Court created “additional safeguards” for when the accused invokes his right to have counsel present during custodial interrogation:
[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [HJaving expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. [Edwards, 451 US at 484-485.]
Edwards concerns only the manner in which the accused, after invoking his right to have counsel present *303 during custodial interrogation, can validly waive that right and thereafter be subjected to further custodial interrogation absent counsel.[5] If the accused is never subjected to custodial interrogation after he has invoked his right to counsel, Edwards is inapplicable. In other words, according to Edwards, the right the accused invokes under Miranda is the right to have counsel present during custodial interrogation. Edwards, 451 US at 485-486 (“The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation.”). In the absence of a post-invocation custodial interrogation, there can be no infringement of that right. See, e.g., Maryland v Shatzer, 559 US 98, 111; 130 S Ct 1213; 175 L Ed 2d 1045 (2010). (“In every case involving Edwards, the courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress.”); Edwards, 451 US at 487 (“We think it is clear that Edwards was subjected to custodial interrogation [at a second meeting with the police] . . . and that this occurred at the instance of the authorities.”).
The pertinent question in this case is not, as the Court of Appeals believed it to be, “whether Evans was *304 a law enforcement officer under Miranda as a matter of law given her status as a parole officer . .. Elliot, 295 Mich App at 636. Although Miranda discussed the constitutional safeguards in terms of “questioning initiated by law enforcement officers,” Miranda, 384 US at 444, neither Miranda’s right to be given a series of warnings nor Edwards’s right to have counsel present apply absent custodial interrogation, regardless of whether a parole officer constitutes a law enforcement officer. Thus, to determine whether a defendant’s Miranda or Edwards rights have been violated, we must first resolve whether the meeting with the parole officer constituted custodial interrogation.[6] Because we *305 conclude that defendant was not subjected to custodial interrogation by the parole officer, we need not further consider whether a parole officer not acting in concert with or at the request of the police may be considered a law enforcement officer for purposes of Miranda. By focusing on the wrong constitutional question, the Court of Appeals considerably expanded the domain of Miranda, particularly with regard to parole officers.
A. “CUSTODIAL INTERROGATION”
In Miranda, the United States Supreme Court defined “custodial interrogation” as “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Id. Custodial interrogation occurs “during ‘incommunicado interrogation of individuals in a police-dominated atmosphere.’ ” Illinois v Perkins, 496 US 292, 296; 110 S Ct 2394; 110 L Ed 2d 243 (1990), quoting Miranda, 384 US at 445. “That atmosphere is said to generate ‘inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely.’ ” Perkins, 496 US at 296, quoting Miranda, 384 US at 467. “ ‘Fidelity to the doctrine announced in Miranda requires that it be enforced... only in those types of situations in which the concerns that powered the decision are implicated.’ ” Perkins, 496 US at 296, quoting Berkemer v McCarty, 468 US 420, 437; 104 S Ct 3138; 82 L Ed 2d 317 (1984).
Where, as here, a parolee is incarcerated for an alleged parole violation, “custodial” means more than *306 just the normal restrictions that exist as a result of the incarceration. Indeed, the United States Supreme Court has held that “imprisonment alone is not enough to create a custodial situation within the meaning of Miranda.” Howes v Fields, 565 US _, _; 132 S Ct 1181, 1190; 182 L Ed 2d 17 (2012); see also Shatzer, 559 US at 112-113. Instead, whether “incarceration constitutes custody for Miranda purposes . . . depends upon whether it exerts the coercive pressure that Miranda was designed to guard against — the ‘danger of coercion [that] results from the interaction of custody and official interrogation.’ ” Shatzer, 559 US at 112 (emphasis and alteration in original), quoting Perkins, 496 US at 297. In determining whether defendant was presented with the same inherently coercive pressures that were the basis for the decision in Miranda, we find Fields instructive.
In Fields, a Michigan prisoner, Randall Fields, was escorted from his prison cell by a corrections officer to a conference room in which he was questioned by two sheriffs deputies about criminal activity he had allegedly engaged in before coming to prison. Fields was questioned for between five and seven hours and was at no time given Miranda warnings or advised that he did not have to speak with the deputies. Fields was told more than once that he was free to leave and return to his cell. The deputies were armed, but Fields remained free of restraints. The conference room door was sometimes open and sometimes shut. Several times during the interview Fields stated that he no longer wanted to talk to the deputies, but he did not ask to go back to his cell. After Fields eventually confessed and the interview concluded, he had to wait an additional 20 minutes for an escort before returning to his cell well after the time when he generally went to bed.
*307 Under these facts, the United States Supreme Court held that Fields was not in custody for purposes of Miranda, and set forth the following constitutional standards:
As used in our Miranda case law, “custody” is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of “the objective circumstances of the interrogation,” a “reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.” And in order to determine how a suspect would have “gauge[d]” his “freedom of movement,” courts must examine “all of the circumstances surrounding the' interrogation.” Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.
Determining whether an individual’s freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of Miranda. We have “decline[d] to accord talismanic power” to the freedom-of-movement inquiry, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda. “Our cases make clear... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody.”
When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which *308 the interrogation is conducted. [Fields, 565 US at _; 132 S Ct at 1189-1190, 1192 (citations omitted; alterations in original).]
The Court then held that questioning a person in prison does not generally “involve the shock that very often accompanies arrest,” that “when a prisoner is questioned, he knows that when the questioning ceases, he will remain under confinement,” that a prisoner “is unlikely to be lured into speaking by a longing for prompt release,” and that a prisoner knows his questioners “probably lack the authority to affect the duration of his sentence.” Id. at _; 132 S Ct at 1190-1191. The Court found it “important” that Fields “was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted.” Id. at _; 132 S Ct at 1193. However, it also noted that Fields “was not advised that he was free to decline to speak with the deputies.” Id. at _; 132 S Ct at 1193. Despite this failing, the Court held that Fields was not in custody for purposes of Miranda.
Pursuant to Fields, the first constitutional step is to determine “whether an individual’s freedom of movement was curtailed. . . .” Fields, 565 US at _; 132 S Ct at 1189. If so, the court should then ask “the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda.” Id. at _; 132 S Ct at 1190. Thus, “[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda.” Id. at _; 132 S Ct at 1189.
In the instant case, the meeting at issue took place in the jail library, it was of short duration (15 to 25 minutes), defendant was not physically restrained, and he was escorted to the library by a deputy, not by the parole officer. We note, as does the dissent, that one *309 difference between this case and Fields is that defendant in this case was never told that he was free to leave the meeting and return to his cell. However, given that the meeting in this case lasted approximately 15 to 25 minutes, and the one in Fields lasted for five to seven hours, we do not think this fact is particularly compelling, much less dispositive, under the circumstances.[7] More significant is the fact that defendant was not free to leave the jail library by himself. In this respect, this situation resembles that of the defendant in Fields-.
Because he was in prison, respondent was not free to leave the conference room by himself and to make his own way through the facility to his cell. Instead, he was escorted to the conference room and, when he ultimately decided to end the interview, he had to wait about 20 minutes for a corrections officer to arrive and escort him to his cell. But he would have been subject to this same restraint even if he had been taken to the conference room for some reason other than police questioning; under no circumstances could he *310 have reasonably expected to be able to roam free. [Id. at_; 132 S Ct at 1193 (emphasis added).]
Moreover, much like the prisoner in Fields, a “reasonable person” in defendant’s “position,” i.e., a parolee,[8] would be aware that a parole officer is acting independently of the police who placed him in custody and has no control over the jail, its staff, or the individuals incarcerated there.[9] Thus, on balance, we conclude that defendant’s “freedom of movement” was not “curtailed” during the meeting at the jail library. Id. at _; *311 132 S Ct at 1189.[10] The facts are consistent with an “ ‘environment in which a reasonable person would have felt free to terminate the interview and leave.’ ” Id. at _; 132 S Ct at 1193, quoting Yarborough v Alvarado, 541 US 652, 664-665; 124 S Ct 2140; 158 L Ed 2d 938 (2004).
Even if defendant could show that his freedom of movement was somehow curtailed during the meeting, he still fails to explain how the meeting “presented] the same inherently coercive pressures as the type of station house questioning at issue in Miranda.” Fields, 565 US at _; 132 S Ct at 1189-1190 (“[W]hether an individual’s freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. . . . We have ‘decline[d] to accord talismanic power’ to the freedom-of-movement inquiry, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda”) (citation omitted; second alteration in original). See also United States v Salyers, 160 F3d 1152, 1159 (CA 7, 1998) (“Custody ‘implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion.’ ”), quoting United States v Martin, 63 F3d 1422, 1429 (CA 7, 1995) (emphasis added).
In this case, there is no evidence of coercion or any other manner of psychological intimidation. The parole *312 officer visited defendant as part of her job as a parole officer; her only reasons for speaking to defendant were to advise him of parole violation charges,[11] advise him of his right to a preliminary hearing on those charges,[12] and to see if he was prepared to waive his right to a preliminary hearing. The officer was required to do all of this as part of her job, regardless of whether defendant was in or out of jail. Defendant cannot show inherently coercive pressures that caused him to discuss the robbery with the parole officer. Defendant was in jail for other parole violation charges (absconding) that were unrelated to the charges Evans was there to serve. Also, unlike in Fields, defendant was not questioned for an extended period of time by armed police officers who used a “ ‘sharp tone’ ” and “profanity.” Fields, 565 US at _; 132 S Ct at 1193 (citation omitted). And also unlike in Fields, in which the defendant indicated on several occasions during the interview that he did not want to talk to the police officers, defendant in this case did not even once indicate that he did not want to talk to the parole officer. Nor is there any evidence that the meeting “continued well past the hour” when defendant “generally went to bed,” id. at _; 132 S Ct at 1193, that the officer had the authority to alter the duration of defendant’s incarceration,[13] or *313 that defendant could not terminate the meeting. This situation does not represent custodial interrogation because defendant was not subjected to the type of coercive pressure against which Miranda was designed to guard. It is hardly the sort of incommunicado, police-dominated atmosphere involving custodial interrogation and the “overbearing” of the subject’s will toward which Miranda was directed. Accordingly, in our judgment, there was no “custodial interrogation” as that term has come to be understood under Miranda and its progeny.
The dissent argues that Fields and Shatzer (another opinion that held that imprisonment alone is insufficient to create a custodial interrogation situation within the meaning of Miranda) are significantly distinguishable from the instant case because the defendants in those cases “were both serving sentences for unrelated crimes and living in the prison in which they were interviewed.” Post at 327. However, the dissent fails to recognize that a parolee who is incarcerated as a result of violating a condition of his parole is at that juncture no different than a prisoner who was never paroled in the first place, at least in the sense that both are imprisoned as a result of their underlying offenses. Defendant here was arrested by the police pursuant to a warrant that was issued because he had absconded *314 from parole. Because defendant was on parole and a warrant for his return had been issued as a result of his violation of a condition of parole, defendant, pursuant to Michigan law, could not be considered anything other than a “prisoner,” as were the defendants in Fields and Shatzer. People v Holder, 483 Mich 168, 172-173; 767 NW2d 423 (2009) (“A paroled prisoner is not considered released; rather, the prisoner is simply permitted to leave the confinement of prison.”); MCL 791.238(1) (“Each prisoner on parole shall remain in the legal custody and under the control of the department.”); MCL 791.238(2) (“A prisoner violating the provisions of his or her parole and for whose return a warrant has been issued by the deputy director of the bureau of field services is treated as an escaped prisoner ....”). Therefore, we do not agree that Fields and Shatzer are distinguishable, much less “significantly” so, on this basis.
In viewing the totality of circumstances in Fields and in the present case, we believe that if there was no custodial interrogation in the Miranda sense in Fields, there was certainly no custodial interrogation in the instant case. In Fields, the defendant was questioned by armed police officers; here, defendant was questioned, if you can even call it that, by an unarmed parole officer. In Fields, the defendant was questioned by armed police officers who were trying to obtain a confession from the defendant; here, defendant met with an unarmed parole officer who was there for the principal purpose of serving defendant with an amended notice of parole violations. In Fields, the defendant was questioned by armed police officers for about 5 to 7 hours; here, defendant met with an unarmed parole officer for 15 to 25 minutes. In Fields, the armed police officers used a “sharp tone” and “profanity” while questioning the defendant for several hours; here, the unarmed *315 parole officer was altogether cordial and sympathetic with defendant during their brief meeting. In Fields, the armed police officers continued to question the defendant until well past his regular bedtime; here, the unarmed parole officer did not keep defendant up late at night. In Fields, the defendant repeatedly stated that he did not want to talk to the armed police officers; here, defendant never indicated in any manner that he did not wish to talk to the unarmed parole officer. We believe it is clear that the totality of circumstances in Fields far more closely resembles the kind of custodial interrogation that generated the extraordinary protections of Miranda than does the totality of circumstances in the present case- yet even in Fields, such circumstances were viewed by the United States Supreme Court to he insufficient to trigger the requirements of Miranda.
Moreover, the “inherently coercive” attributes of the parolee/parole officer relationship that the Court of Appeals relied on in reaching its conclusions are wholly inapplicable here because Evans was not defendant’s supervising officer. The Court of Appeals explained:
The rationale for the suppression of statements elicited during a custodial interrogation by a law enforcement officer who does not adhere to Miranda is to “combat” the “inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely.” Miranda, 384 US at 467; see also [People v] Williams, 244 Mich App [533, 539; 624 NW2d 575 (2001)]. Such “inherently compelling pressures” exist in the relationship between a parolee and a parole officer. Indeed, this Court has recognized that “both parolees and probationers are under heavy psychological pressure to answer inquiries made by their supervising officers.” People v Faulkner, 90 Mich App 520, 524; 282 NW2d 377 (1979) (quotation marks and *316 citations omitted). This heavy psychological pressure exists because of the unique relationship between a parolee and parole officer.
... [T]he parolee-parole officer relationship often becomes a relationship of trust and confidence, as does the probationer-probation officer relationship addressed by Justice Marshall in Murphy. See Murphy, 465 US at 459-460 (Marshall, J., dissenting). As a parolee develops trust and begins to confide in a parole officer, the parole officer is more likely to elicit from the parolee incriminating statements that the parolee would likely not make to a police interrogator. [Elliot, 295 Mich App at 643.]
However, the Court of Appeals failed to recognize that the parole officer in the instant case was not defendant’s parole officer and thus that they did not have the kind of “unique relationship” of “trust and confidence” that the Court of Appeals assumed that they did.[14] Indeed, much, if not all, of the persuasive authority cited by the Court of Appeals seems inapposite when someone other than the defendant’s supervising parole officer is conducting the meeting.[15]
B. MINNESOTA v MURPHY
In Minnesota v Murphy, 465 US 420; 104 S Ct 1136; 79 L Ed 2d 409 (1984), the respondent was given a suspended prison sentence and placed on probation. During the course of a meeting at his probation officer’s office, the respondent, upon questioning by his probation officer, admitted that he had committed a rape and *317 murder in 1974. The probation officer had previously received information from a treatment counselor that respondent had admitted to the 1974 crimes.
The respondent moved to suppress the confession, but the trial court found that he had not been in custody at the time of the confession and that the confession was neither compelled nor involuntary despite the absence of Miranda warnings. The Minnesota Supreme Court reversed, holding that the respondent’s
failure to claim the privilege when he was questioned was not fatal to his claim “[bjecause of the compulsory nature of the meeting, because [the respondent] was under court order to respond truthfully to his agent’s questions, and because the agent had substantial reason to believe that [the respondent’s] answers were likely to be incriminating.” [Murphy, 465 US at 425, quoting State v Murphy, 324 NW2d 340, 344 (Minn, 1982) (first alteration in original).]
The United States Supreme Court reversed, holding that Miranda warnings are not necessary during the course of a routine probation interview, even when there is a connection between the probation officer-interviewer and the criminal investigative process. The Court rejected the proposition that the fact that the probation officer was consciously seeking incriminating evidence was relevant. Murphy, 465 US at 431 (“[T]he probation officer’s knowledge and intent have no bearing on the outcome of this case.”). The Court also rejected the argument that the respondent might have reasonably expected that his statements to the probation officer would remain confidential:
[W]e cannot conclude that [the probation officer’s] actions would have led a reasonable probationer to believe that his statements to her would remain confidential. A probationer cannot pretend ignorance of the fact that his probation officer “is a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace offic *318 ers.” ... The fact that [the respondent] apparently expressed no surprise on being informed that his statements would be made available to the police, moreover, strongly suggests that he was not misled by any expectation that his statements would remain confidential. [Id. at 432.]
Finally, the Court held that
the coercion inherent in custodial interrogation derives in large measure from an interrogator’s insinuations that the interrogation will continue until a confession is obtained. Since [the respondent] was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator. [Id. at 433 (citation omitted).][16]
Some courts have noted that a parole officer’s questioning can be inherently more coercive than a law enforcement officer’s questioning because the parole officer can put the parolee in prison more easily than can a police officer.[17] However, whatever the merits of this analysis, this concern does not exist to the same extent once the accused is already in jail for a parole *319 violation because the primary source of the parole officer’s potential for coercion no longer exists. In this sense, a meeting after the accused has been arrested for violating his parole presents a less threatening situation than one conducted by a parole or probation officer before the accused has been arrested. In this case, defendant had already been given notice that his parole was being revoked and that he was in jail for that reason. Thus, no parole officer could threaten to put him in jail; he was already there. Moreover, this was not his parole officer. Defendant could not reasonably be under any illusions that Evans would have possessed any power to immediately free or detain him when he was not even her charge. As was the case in Murphy, there “is no direct evidence that [defendant] confessed because he feared that his probation would be revoked if he remained silent.” Id. at 437. Similarly, defendant’s request at the end of the meeting that the parole officer convey to the police that he wished to speak to them “strongly suggests that he was not misled by any expectation that his statements would remain confidential.” Id. at 432.
C. ESTELLE v SMITH
Unlike the dissent, we disagree that Estelle v Smith, 451 US 454; 101 S Ct 1866; 68 L Ed 2d 359 (1981), is particularly “instructive” with regard to the question at issue here-custody. Post at 333. Indeed, Estelle did not even address that issue. Instead, Estelle simply assumed that the respondent in that case was in custody for Miranda purposes because he “was in custody at the Dallas County Jail when the examination was ordered *320 and when it was conducted.” Id. at 467. Moreover, since Estelle was decided, the Court has affirmatively held that prisoners are not invariably in custody for purposes of Miranda. See Fields, 565 US at _; 132 S Ct at 1190. Because Estelle predated Fields and thus did not engage in the analysis that Fields now requires in determining whether an accused/prisoner was in custody for Miranda purposes, we do not believe that Estelle is relevant with regard to whether defendant was in custody for Miranda purposes, which the dissent agrees is the controlling issue.[18]
Moreover, Estelle is also significantly distinguishable because it involved a court-ordered psychiatric examination. In Estelle, the Court held that the admission of a psychiatrist’s testimony to establish an element of proof necessary to support the imposition of capital punishment violated the respondent’s Fifth Amendment privilege against compelled self-incrimination. The psychiatrist’s testimony related to a 90-minute pretrial competency examination that the psychiatrist had administered to the respondent.[19] The Court em *321 phasized that the competency examination “was ordered even though defense counsel had not put into issue [the respondent’s] competency to stand trial or his sanity at the time of the offense,” Estelle, 451 US at 457 n 1, and that this was a “compulsory examination,” to which the respondent was “compelled to respond,” yet “he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death,” id. at 467-468. The Court summarized:
To meet its burden, the State used respondent’s own statements, unwittingly made without an awareness that he was assisting the State’s efforts to obtain the death penalty. In these distinct circumstances, the Court of Appeals correctly concluded that the Fifth Amendment privilege was implicated.
A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding....
. .. [U]nder Miranda v Arizona, we must conclude that, when faced while in custody with a court-ordered psychiatric inquiry, respondent’s statements to Dr. Grigson were not “given freely and voluntarily without any compelling *322 influences” and, as such, could be used as the State did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them. [Id. at 466, 468 (citation omitted; emphasis added).]
Unlike what occurred in Estelle, there was no court-ordered “compulsory examination” to which defendant was “compelled to respond” in this case. As a result, Estelle is wholly inapplicable.[20]
IV CONCLUSION
Neither an accused’s right under Miranda to be given a series of warnings nor an accused’s right under Edwards to have counsel present apply absent custodial interrogation. Because defendant was not subjected to custodial interrogation by the parole officer, even if she was a law enforcement officer, neither of those rights were violated, and thus the trial court did not err by admitting defendant’s confession. Accordingly, we reverse the judgment of the Court of Appeals and reinstate defendant’s conviction and sentence.
Kelly, Zahra and Viviano, JJ., concurred with Markman, J.

 Defendant was adjudicated responsible as a juvenile in 1982 for assault and battery and in 1983 for fourth-degree criminal sexual conduct. In 1987, defendant pleaded guilty to minor in possession. In 1990, he pleaded guilty to operating a vehicle while under the influence of alcohol, and in 1991, he pleaded guilty to three counts of assault and battery and one count of disturbing the peace. In that same year, he also pleaded guilty to assaulting a police officer and, when he violated probation, he was sent to prison. Also in 1991, in separate cases, he pleaded guilty to malicious destruction of property over $100 and malicious destruction of property under $100. In 1992, he pleaded guilty to misdemeanor resisting a police officer and spent 20 days in jail. In 1993, he pleaded guilty to both possessing an open intoxicant and urinating in public. In 1994, he was convicted of unarmed robbery and sentenced to 5 to 30 years in prison. In 2003, shortly after his release from prison, he pleaded guilty to resisting a police officer and received yet another prison term.

 Before going to the jail, Evans reviewed the police report that was created following the robbery. She learned from another parole officer that defendant’s brother had turned defendant in. She also talked to a detective, Ed Smith, who had questioned defendant at the jail a few days earlier. Evans testified that “what we generally do is, if they’re in the middle of an investigation, we just ask them whether or not - if I can go talk to the person without interfering with their investigation, because our issue is separate than theirs.” Smith testified that he told Evans that defendant had requested an attorney, but Evans testified that she did not recall Smith telling her that.

 The Court of Appeals also held that the trial court did not clearly err by finding that Evans had not acted in concert with, or at the request of, the police. Elliott, 295 Mich App at 636. Defendant does not appeal that holding. Thus, our order granting the prosecutor’s application stated as follows:
The parties shall address whether, and, in light of Howes v Fields, 565 US _; 132 S Ct 1181; 182 L Ed 2d 17 (2012), under what custodial circumstances, a parole officer not acting in concert with police is required to provide the warnings prescribed by Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), before questioning an in-custody parolee who, during police questioning, has previously invoked his right to counsel under Edwards v Arizona, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981), about an offense giving rise to an alleged parole violation, if the parole officer’s testimony concerning the parolee’s responses to such questioning is to be admissible at the trial for that offense. [Elliott, 491 Mich 938.]

 The United States Constitution and the Michigan Constitution both prohibit “compelled” self-incrimination. US Const, Am V (“No person shall... he compelled in any criminal case to be a witness against himself. . . .”); Const 1963, art 1, § 17 (“No person shall he compelled in any criminal case to be a witness against himself. . . .”).

 The prosecutor does not argue that defendant validly waived the right to have counsel present during custodial interrogation. Rather, he simply argues that defendant did not have the right to have counsel present during his meeting with Evans. Because we agree, we also do not address waiver in this opinion. That is, unlike the dissenting opinion, we conclude that because the parole officer did not subject defendant to custodial interrogation, defendant had no right to counsel dining his meeting with the parole officer. Because we conclude that defendant had no right to counsel to waive, we do not need to address the concurring opinion’s conclusion that defendant waived that right. The dissenting opinion would broaden the concept of custodial interrogation and thereby ensure that in some unknown number of future cases, voluntary confessions such as that which occurred in this very case, would be rendered inadmissible.

 Although we agree with the dissent that defendant “could not be subjected to further custodial interrogation about the robbery until counsel had been made available to him or he initiated communication,” post at 325-326 (emphasis added), we disagree that “Evans’s interview of defendant about the robbery [cannot] be viewed as noncustodial because custody, for purposes of Miranda and Edwards, was not broken between the initial interrogation by the police and Evans’s subsequent questioning three days later,” post at 326. For all of the reasons set forth in this opinion, we believe that defendant’s meeting with the parole officer cannot be viewed as the same as his meeting with the police in terms of constituting “custodial interrogation.” Further, however, we believe it is clear that these constituted entirely distinct episodes, distinct in terms of when they occurred, distinct in terms of their participants, distinct in terms of who was doing the interrogation, distinct in terms of their venue, distinct in terms of their subject matter and purpose, distinct in terms of their coercive aspects, and distinct in terms of the overall environment in which they took place. That one of these episodes can be characterized as involving custodial interrogation carries no particular significance in terms of whether the other can be similarly characterized, as it must be, before defendant’s Miranda rights are implicated. Although, by treating these distinct episodes as part of a “continuing” sequence of events that “never ceased” the dissent can impute the attributes of one meeting to the other meeting, we do not believe this accurately describes the relationship between the events. Indeed, the dissent itself acknowledges that the police “stopped questioning” defendant when he invoked his right to have counsel present, and the dissent identifies no reason why the custodial interrogation that existed during *305 the meeting with the police should necessarily be thought to carry over to the meeting with the parole officer. The only relevant question under Edwards is whether the meeting with the parole officer did or did not constitute custodial interrogation, and we believe that it did not.

 See Stansbury v California, 511 US 318, 322; 114 S Ct 1526; 128 L Ed 2d 293 (1994) (“In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation ....”) (emphasis added). The dissent states that “the Fields majority cited the fact that the defendant in that case was told he was free to leave as the ‘[m]ost important’ factor in its determination that the defendant was not in custody.” Post at 329 (alteration in original). More precisely, however, the Court found this fact to he the “most important” only in “offset[tingl” the facts that supported the “argument that Miranda’s custody requirement was met: The interview lasted for between five and seven hours in the evening and continued well past the hour when respondent generally went to bed; the deputies who questioned respondent were armed; and one of the deputies, according to respondent, ‘[u]sed a very sharp tone’.. ..” Fields, 565 US at _; 132 S Ct at 1193 (alteration in original). As defendant in this case was not interviewed for five to seven hours late into the night by armed deputies who used a sharp tone, it is of considerably less relevance that the parole officer did not apprise defendant that he was free to return to his cell, because no such similarly harsh circumstances existed in the first place that needed to be “offset” by this fact.

 Berkemer v McCarty, 468 US 420, 442; 104 S Ct 3138; 82 L Ed 2d 317 (1984) (“[T]he only relevant inquiry is how a reasonable man in the suspect’s position would have understood his situation.”); Yarborough v Alvarado, 541 US 652, 663; 124 S Ct 2140; 158 L Ed 2d 938 (2004) (“Courts must examine ‘all of the circumstances surrounding the interrogation’ and determine ‘how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.’ ”). Relevantly, the suspect in Yarborough was also not told “that he was free to leave.” Id. at 655.

 Fields, 565 US at _; 132 S Ct at 1191 (2012), quoting Perkins, 496 US at 297 (“ ‘When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners.’ ”). See also, In JDB v North Carolina, _ US _, _; 131 S Ct 2394, 2404, 2406; 180 L Ed 2d 310 (2011) (stating that “so long as the child’s age was known to the officer at the time of police questioning ... its inclusion in the custody analysis is consistent with the objective nature of [the Miranda custody] test” because “a child’s age differs from other personal characteristics that. . . have no objectively discernible relationship to a reasonable person’s understanding of his freedom of action”). JDB thus distinguished age from a suspect’s “prior interrogation history with law enforcement,” noting that the latter could not be considered without compromising the objective nature of the custody analysis because the effect of this experience is contingent on the psychology of the individual suspect. Id. at _; 131 S Ct at 2404. We do not think it is an unreasonable or “subjective” conclusion that a parolee is more generally aware, precisely because he or she is a parolee, that a parole officer acts independently of the police and has no control over the jail, its staff, or the individuals incarcerated there.

 The dissent, post at 331 n 17, errs in its suggestion that Fields did not discuss defendant’s status as an inmate in the “freedom of movement” inquiry in that case. See Fields, 565 US at _; 130 S Ct at 1193 (stating that because the respondent was in prison “under no circumstances could he have reasonably expected to be able to roam free”). We believe that defendant’s “parolee status” is similarly relevant. See also, Shatzer, 559 US at 107-108.

 See MCL 791.239a(2) (“Prior to the preliminary hearing, the accused parolee shall be given written notice of the charges . ...”)

 See MCL 791.239a(1) (“Within 10 days ¿fter an arrest for an alleged violation of parole, the parolee shall be entitled to a preliminary hearing to determine whether there is probable cause to believe that the conditions of parole have been violated or a fact-finding hearing held pursuant to [MCL 791.240a].”)

 Contrary to the dissent’s suggestion, the mere fact that Evans, who was not even defendant’s supervising parole officer, “was present at the jail to serve parole violation charges on defendant” does not mean that Evans had the “ ‘authority to affect the duration of his sentence ....’” Post at 332, quoting Fields, 565 US at _; 132 S Ct at 1191. As explained *313 in Fields, 565 US at _; 132 S Ct at 1191, “a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence.” (Emphasis added.) Also, the dissent offers no factual support for its assertion that “Evan’s influence Mould have been critical” regarding “how much time defendant served... .” Post at 332-333 n 21. Instead, it appears that Evans merely filled in for defendant’s supervising parole officer and completed the single discrete task of serving defendant with an amended notice of parole violations, and that defendant’s supervising parole officer was the one ultimately responsible for overseeing his parole violation.

 Even if, as the dissent asserts, defendant and Evans had developed a “unique relationship” of “trust and confidence” that created some “psychological pressure” on defendant to answer Evans’s inquires, this would not necessarily have converted defendant’s otherwise voluntary statements into compelled ones.

 See, e.g., Elliott, 295 Mich App at 642-643, citing Murphy, 465 US at 459-460 (Marshall, J., dissenting).

 The Court further noted that the rule in Miranda was crafted to apply to a situation that “thrusts an individual into ‘an unfamiliar atmosphere’ or ‘interrogation environment. .. created for no purpose other than to subjugate the individual to the will of his examiner.’ ” Murphy, 465 US at 433, quoting Miranda, 384 US at 457. The situation is one that “is said to convey to the suspect a message that he has no choice but to submit to the officers’ will and to confess.” Murphy, 465 US at 433.

 See 2 LaFave, Criminal Procedure (3d ed), § 6.10(c), p 878 (“[SJome courts have reached [the conclusion] that custodial interrogation (other than routine interviews) by a probation or parole officer is governed by Miranda because the probationer or parolee is under ‘heavy psychological pressure to cooperate’ with one who can recommend his imprisonment.”) (citations omitted); State v Gallagher, 46 Ohio St 2d 225, 227; 348 NE2d 336 (1976) (“[A] parolee is under heavy pressure to cooperate *319 with his parole officer * * * (who, allegedly,) had the power to recommend the return to prison of a parolee under his charge ... .”) (citation and quotation marks omitted).

 The dissent cites Estelle for the proposition that somebody other than a police officer, such as a psychiatrist who performs a court-ordered psychiatric examination, can conduct a custodial interrogation for purposes of Miranda. We do not necessarily disagree with this proposition. However, as both this and the dissenting opinions recognize, “the dispositive issue is whether defendant was subject to custodial interrogation, not the nature of the relationship between the questioner and defendant.” Post at 324. Because we conclude that defendant was not subjected to a custodial interrogation for Miranda purposes, it is wholly unnecessary to address whether a parole officer is a law enforcement officer for Miranda purposes. Infra at 303-305.

 The Court explained the circumstances of the examination and how those circumstances implicated the Fifth Amendment:
The fact that respondent’s statements were uttered in the context of a psychiatric examination does not automatically remove them from the reach of the Fifth Amendment. The state trial *321 judge, sua sponte, ordered a psychiatric evaluation of respondent for the limited, neutral purpose of determining his competency to stand trial, but the results of that inquiry were used by the State for a much broader objective that was plainly adverse to respondent. Consequently, the interview with Dr. Grigson cannot he characterized as a routine competency examination restricted to ensuring that respondent understood the charges against him and was capable of assisting in his defense. Indeed, if the application of Dr. Grigson’s findings had been confined to serving that function, no Fifth Amendment issue would have arisen. [Estelle, 451 US at 465 (citation omitted).]

 We also note that Estelle concerned the Sixth Amendment right to counsel, not the Fifth Amendment right to counsel:
Because psychiatric examinations of the type at issue here are conducted after adversary proceedings have been instituted, we are not concerned in this case with the limited right to the appointment and presence of counsel recognized as a Fifth Amendment safeguard in Miranda. See Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. Rather, the issue before us is whether a defendant’s Sixth Amendment right to the assistance of counsel is abridged when the defendant is not given prior opportunity to consult with counsel about his participation in the psychiatric examination. [Estelle, 451 US at 470 n 14 (citation omitted).]