*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY BOLES,

        Defendant-Appellant.

UNPUBLISHED
April 9, 2020

No. 345630
Saginaw Circuit Court
LC No. 17-044413-FH

Before: TUKEL, P.J., and MARKEY and SWARTZLE, JJ.

PER CURIAM.

Defendant was convicted by a jury of larceny in a building, MCL 750.360, and assault and battery, MCL 750.81. He was sentenced as a fourth-offense habitual offender, MCL 769.12, to 30 months to 15 years' imprisonment for the larceny conviction and 93 days' incarceration for the assault and battery conviction. Defendant appeals by right. We affirm.

Defendant was accused of stealing Sheri Wenglikowski's cellular telephone from her office at St. Mary's Hospital. Defendant was also charged with assaulting David Revard, St. Mary's head of security, after Revard attempted to detain defendant during his investigation. Wenglikowski testified that on November 7, 2017, she left her cell phone behind in her office when she stepped out to visit another part of the hospital; it was missing when Wenglikowski returned to her office. St. Mary's surveillance video showed that a suspect entered the hospital, went into Wenglikowski's general office area, and then left. The video did not show the suspect actually entering Wenglikowski's office because it was outside the camera range.

Wenglikowski testified that she used a telephone-tracking application to locate her cell phone. Wenglikowski contacted St. Mary's security about the incident and gave Revard the location of her phone based on the tracking application. Revard reviewed the surveillance video and contacted the police. Police Officer Jeremey Holden was dispatched, and Revard and Officer Holden unsuccessfully attempted to retrieve the phone from the address Wenglikowski provided. We note that, like Revard, Officer Holden reviewed the video footage from St. Mary's. Subsequently, Wenglikowski called Revard and told him that the tracking application indicated that her cell phone was located approximately two blocks from St. Mary's. While still on the

phone with Wenglikowski, Revard and St. Mary's Security Officer Cole Thompson traveled to the location Wenglikowski provided.

At the location, Revard and Thompson came into contact with defendant. They tried to get defendant to stop, but defendant continued to walk away from them. Revard testified that he then attempted to detain defendant, that defendant became verbally abusive, and that defendant punched Revard. Wenglikowski, who had remained on the line with Revard, pushed an alert that made her phone ring, and Revard and Thompson heard a phone ring. Revard reached into defendant's pocket and found Wenglikowski's cell phone. Officer Holden then arrived at the scene, and after defendant requested a lawyer, defendant voluntarily expressed that he had found the cell phone and was trying to return it.

Before trial, defendant filed a motion in limine on various matters. One of defendant's arguments was that the best-evidence rule demanded that the video footage from St. Mary's be played for the jury so that the jurors could decide if it were defendant in the video.[1] Although defendant did not specifically argue in the motion that Revard should be precluded from testifying that it was defendant in the video footage, that subject arose at the hearing on the motion. And the trial court ruled that Revard would not be permitted to identify defendant as the person seen in the video when the video was played for the jury and narrated by Revard. But the court did state that Revard could inform the jury that he later stopped and detained defendant on the basis of what he observed in the video footage.

At trial, Revard testified about the surveillance-video footage. Revard indicated that he reviewed a higher-quality version of the surveillance footage before it was copied onto a CD-ROM. Revard testified about what the video footage depicted, including the layout of the building and where the suspect was located in the building. Revard explained that still photographs were created from the footage. Additionally, on the basis of his review of the video footage, Revard testified that the suspect was a black male with a dark mustache and wore a black "hoodie." Revard, as he provided narration while the video was played, did not give an opinion that it was indeed defendant in the video footage, thereby remaining faithful to the trial court's pretrial ruling on the motion in limine. Revard did testify that when he encountered defendant and attempted to detain him, it was on the basis of Revard's belief that defendant was the same person visible in the video. During Officer Holden's testimony, he explained that when he arrived at the scene where defendant was apprehended, he recognized defendant from the surveillance video.

Defendant first argues on appeal that the trial court erred when it allowed Revard and Officer Holden to offer lay-opinion testimony that identified defendant as the suspect seen in the video footage. Because this particular issue was effectively raised and addressed at the hearing on the motion in limine, we will consider defendant's argument on appeal as having been preserved. See *People v Metamora Water Serv, Inc,* 276 Mich App 376, 382; 741 NW2d 61 (2007) ("For an

---

[1] Defendant indicated in the motion in limine that he expected that Revard would testify and identify defendant as the person seen in the video footage. Defendant further maintained that a reasonable juror could come to a contrary conclusion.

issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court.").[2]

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). "When the decision regarding the admission of evidence involves a preliminary question of law, such as whether a statute or rule of evidence precludes admissibility of the evidence, the issue is reviewed de novo." *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003). A trial court necessarily abuses its discretion when it makes an error of law. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013).

MRE 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court," and that "[e]vidence which is not relevant is not admissible." Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. MRE 701 addresses opinion testimony by lay witnesses, providing as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

"Where a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v Perkins*, 314 Mich App 140, 161-162; 885 NW2d 900 (2016) (quotation marks, citation, and alteration omitted).[3] Defendant argues that Revard and Officer Holden were in no better position than the jury to identify defendant in the video footage; therefore, their lay-opinion testimony improperly invaded the province of the jury. In support of his position, defendant relies, in relevant part, on *Perkins* and *People v Fomby,* 300 Mich App 46; 831 NW2d 887 (2013).

---

[2] We recognize that Officer Holden's anticipated testimony was not specifically addressed in the motion in limine and at the hearing. But the general subject matter discussed at the hearing in regard to leaving it to the jurors to ascertain whether it was defendant in the video necessarily extended to any witness who might attempt to invade the province of the jury.

[3] This Court vacated in part the opinion in *Perkins* with respect to a sentencing issue regarding juvenile lifers and the right to jury trial, convening a special panel on the sentencing issue. *People v Perkins*, unpublished order of the Court of Appeals, entered February 12, 2016 (Docket Nos. 323454, 323876, and 325741). *Perkins* encompassed three consolidated appeals, including *People v Hyatt*, and the conflict panel's subsequent decision superseded *Perkins* as to the sentencing issue. *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016). *Hyatt* was then affirmed in part and reversed in part by our Supreme Court in *People v Skinner*, 502 Mich 89; 917 NW2d 292 (2018), which had been consolidated with *Hyatt*.

In *Fomby*, the defendant argued that the testimony of Sergeant Ron Gibson, a certified video forensic technician, constituted improper lay-opinion testimony because his testimony invaded the province of the jury. *Fomby*, 300 Mich App at 48. Gibson testified that individuals seen in still-frame photographs produced from a surveillance video were the same individuals depicted in the surveillance video itself. *Id*. at 49. This Court first concluded that for purposes of MRE 701 Gibson's testimony was "rationally based on his perception." *Id*. at 50. The *Fomby* panel explained:

> Gibson was not at the scene while the video footage was being recorded and did not observe firsthand the events depicted on the video. Instead, Gibson watched the video, produced short clips of the individuals while they were inside the store, and isolated certain frames to create still images. On the basis of his scrutiny of the video surveillance footage and the still images he created from the video, Gibson provided his opinions regarding the identity of individuals within the video as compared to the still images from portions of the video. . . . .
>
> [W]hile Gibson was not at the scene when the events depicted in the video were occurring, Gibson testified that he created the still photos from the surveillance video and cropped some of the photos to create a closer view. The purpose for creating the still photos was to determine whether the two suspects had come to the BP gas station earlier in the evening before the murder took place. . . . [I]t can be inferred from Gibson's testimony that he viewed the video and the still photos several times in order to draw his conclusions and opinions about the identity of the individuals in the surveillance video and still photos as compared to other individuals depicted in the same evidence. [*Id.* at 50-51.]

This Court next ruled that "Gibson's testimony was intended to provide a clearer understanding about whether the two suspects depicted in the video had been to the BP gas station earlier in the evening, a fact at issue in the case." *Id.* at 51. The Court observed:

> Because it can be inferred that Gibson viewed the surveillance footage and still photos several times to reach his conclusions and opinions, it can similarly be reasonably inferred that Gibson's testimony helped the jury to correctly and efficiently determine whether the two individuals seen earlier in the footage were the same individuals who were involved in the murder later depicted in the video. [*Id*. at 52.]

Finally, and particularly pertinent here, the *Fomby* panel held that "Gibson's testimony did not invade the province of the jury." *Id.* The Court reasoned as follows:

> Gibson's testimony only linked individuals depicted in the surveillance video as being the same individuals depicted in the still photographs. While a witness cannot express an opinion on the defendant's guilt or innocence of the charged offense, Gibson expressed no such opinion. Further, because Gibson was comparing the video surveillance video to still images that he himself had created from the six-hour long video, Gibson was in the best position to identify the

-4-

individuals in the photographs as being the same as those depicted in the video. Gibson's testimony did not invade the province of the jury. [*Id.* at 53.]

In *Perkins*, this Court held that the trial court abused its discretion by allowing an officer to opine that certain video footage and still frames from an apartment's stairwell where a murder occurred showed the defendant. *Perkins*, 314 Mich App at 160. The *Perkins* panel distinguished *Fomby*, explaining:

> Unlike the witness in *Fomby* who testified that the individual in the video footage was the same individual in still images but did not specifically identify the defendant as the individual in the images, [the officer here] affirmatively identified [the defendant] as the individual in the stairwell. [The officer] could properly comment that, based on his experience, the individual appeared to be concealing a weapon, but [the officer] should not have been allowed to identify [the defendant] as that individual. . . . There was nothing about the images (i.e. poor quality of the images, defendant wearing a disguise) that necessitated [the officer's] opinion. This is evidenced by the trial court's own statement during defense counsel's objection that "I would have no trouble making an identification myself." [*Id.* at 161-162.]

In the instant case, neither Revard nor Officer Holden explicitly testified that it was his opinion that the suspect seen in the video footage and the photographs was defendant. But Revard and Officer Holden did testify that they recognized defendant from the surveillance video when they first encountered him in person. Thus, it could be said that the two men indirectly identified defendant as the suspect seen in the video footage. The trial court ruled before trial that Revard could not opine that defendant was the person in the video. On the other hand, the court stated that Revard could testify that he attempted to stop defendant on the basis of Revard's viewing of the video footage.

We do not wish to engage in a game of semantics on this issue. But we do believe that there is a distinction, however nuanced, between Revard's testifying to the jury that in his opinion defendant was the individual seen in the video footage and his testifying that he stopped defendant because of what he saw in the video. The purpose of the latter testimony was not to identify defendant as the perpetrator based on examination of the video or photographs, but to simply explain to the jury why Revard decided to detain defendant in the first place. As to Officer Holden's testimony that he recognized defendant from the surveillance footage, it is arguable that the testimony merely informed the jury that the recognition of defendant, along with other evidence, served as the bases to arrest defendant and take him into custody.

Additionally, with respect to Revard's testimony, he indicated that he reviewed a higher-quality version of the surveillance-video footage before it was copied onto a CD-ROM which was played for the jury. Also, the still photographs of the larceny suspect derived from the video were

of even lower quality.[4]  Therefore, Revard was in a better position than the jurors to identify the person in the video footage.  See *Perkins*, 314 Mich App at 161-162; *Fomby*, 300 Mich App at 52-53.  We suspect, given the circumstances and the timing of events, that Officer Holden probably viewed the same video footage that Revard examined.

We conclude that there was no abuse of discretion by the court in allowing the evidence, but because defendant's argument has some merit, we further hold that if there were error, it  was harmless.[5]  MCL 769.26 provides as follows:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

In *Lukity*, 460 Mich at 495, the Michigan Supreme Court construed MCL 769.26, stating as follows:

> Section 26 places the burden on the defendant to demonstrate that after an examination of the entire cause, it shall affirmatively appear that the error asserted has resulted in a miscarriage of justice. . . . [R]eversal is only required if such an error is prejudicial and the appropriate inquiry focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence. The object of this inquiry is to determine if it affirmatively appears that the error asserted undermines the reliability of the verdict. In other words, the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error.  [Quotation marks, citations, and alteration omitted.]

First, Revard and Officer Holden did not directly and specifically opine or testify that defendant was guilty or that he was the person in the video footage.  Second, the nature of their testimony only indirectly indicated that defendant was the person in the video footage.  It was for the jury to render its own assessment on the matter.  Third, defendant generally fit the description of the person seen in the surveillance video.  Fourth, defendant fled when Revard and Thompson approached him, which was circumstantial evidence of a consciousness of guilt, *People v Craft*, 325 Mich App 598, 612; 927 NW2d 708 (2018), and which entirely undermined defendant's claim that he innocently found the phone and sought to return it.  And finally, *defendant was found in*

---

[4] We note that two photographs derived from the video footage were admitted into evidence.  The prosecution also introduced a photograph of defendant taken at the scene of the assault, which photograph is not encompassed by defendant's argument on appeal.

[5] We note that the video footage had no bearing on the assault and battery conviction.

*actual possession of the stolen cell phone.* Under this factual scenario, any assumed error was harmless, and no miscarriage of justice would occur by affirming the convictions.[6]

Defendant, in a Standard 4 brief, additionally argues that evidence of the cell phone found in his possession should have been suppressed because he did not receive a *Miranda*[7] warning. In *Miranda*, the United States Supreme Court held that the Fifth Amendment's prohibition against compelled self-incrimination requires that an accused be given certain warnings before being subjected to a custodial interrogation. *People v Elliott*, 494 Mich 292, 301; 833 NW2d 284 (2013). In *People v Campbell*, __ Mich App __, __; __ NW2d __ (2019); slip op at 9, this Court observed:

> Potential [*Miranda*] violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. Physical evidence obtained as a result of an unwarned statement remains admissible as long as the statement was voluntary. It is only the physical fruits of an actually coerced statement that must be suppressed to serve the deterrent purpose of the exclusionary rule. [Quotation marks and citations omitted.]

Defendant has simply not established that the cell phone was a "physical fruit" of an unwarned coerced statement; therefore, his argument that the cell phone should have been suppressed fails. To the extent that defendant may be making an additional constitutional argument, we see nothing that warrants reversal.

We affirm.

/s/ Jonathan Tukel
/s/ Jane E. Markey
/s/ Brock A. Swartzle

---

[6] With respect to defendant's associated claim of ineffective assistance of counsel, we note that counsel generally raised the issue in dispute in the motion in limine. Regardless, assuming deficient performance by counsel for not objecting to the challenged testimony and that the testimony was indeed inadmissible, defendant fails to establish the requisite prejudice for the reasons discussed above. See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

[7] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).