# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAMES CORNELIUS BROWN,

Defendant-Appellant.

UNPUBLISHED
September 22, 2015

No. 321599
Macomb Circuit Court
LC No. 2013-000099-FC

Before: GADOLA, P.J., and JANSEN and BECKERING, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of four counts of first-degree murder, MCL 750.316(1)(a), four counts of disinterment, mutilation, defacement, or carrying away of a human body, MCL 750.160, one count of arson of real property, former MCL 750.73, and one count of arson of personal property worth more than $1,000 but less than $20,000, former MCL 750.74(1)(c)(*i*).[1] The trial court sentenced defendant to life imprisonment without parole for each of the four first-degree murder convictions, 57 to 120 months' imprisonment for each of the disinterment, mutilation, defacement, or carrying away of a human body convictions and the arson of real property conviction, and 36 to 60 months' imprisonment for the arson of personal property worth more than $1,000 but less than $20,000 conviction. We affirm with respect to all but two of defendant's convictions under MCL 750.160, which we reverse.

## I. BACKGROUND

This case involves the deaths of four women, Renisha Landers, Demesha Hunt, Natasha Curtis, and Vernithea McCrary. On December 19, 2011, officers reported to 14499 Promenade Street on the east side of Detroit after receiving a call that two women were found dead in the trunk of a vehicle. The vehicle was a gray Chrysler 300 and was backed into an empty, open

---

[1] Defendant was charged and convicted under former MCL 750.73 and MCL 750.74(1)(c)(*i*). In 2012, the Legislature passed 2012 PA 531 and 2012 PA 532, both effective April 3, 2013, which reorganized these crimes under new statutory designations. Arson of a building or structure is now a crime under MCL 750.74, and arson of personal property worth more than $1,000 but less than $20,000 is a crime under MCL 750.75(1)(a)(*i*).

-1-

garage by a vacant house. The police discovered the vehicle was registered to Renisha Landers by running its identification number through the Michigan Law Enforcement Information Network. The women were later identified as Renisha Landers and Demesha Hunt.

On December 25, 2011, police and fire personnel reported to 14903 Lannette Street on the east side of Detroit in response to a call that a vehicle was on fire, and discovered two badly burned bodies in the trunk of the car. The vehicle was a 1997 Buick LaSabre that was backed into an empty, open garage next to a vacant house. Both the vehicle and the garage were damaged by the fire. Lieutenant Dennis Richardson, a fire investigation expert, testified that he believed the fire was caused by human hands because there were no alternative electrical or mechanical sources. The vehicle did not have a license plate. The bodies in the trunk were later identified as Natasha Curtis and Vernithea McCrary.

A homicide task force began investigating both incidents together after recognizing similarities between the age and race of the victims, the location and manner of disposal of the bodies, and that all of the women except Hunt had ads on Backpage.com, a website where persons could solicit sexual services. After obtaining the victims' cell phone records, the police discovered one common phone number between the two groups of women, which was registered to defendant. The police also learned that defendant frequently got new cell phones, made several calls relating to sexual services websites in December 2011, and grew up four blocks from where the bodies were recovered.

On May 1, 2012, defendant was arrested in connection with the women's deaths. At the time, defendant was living with his mother in Sterling Heights. Defendant was booked and transported to the homicide unit where Detroit Police Detectives Ernest Wilson and Derryck Thomas interviewed him. Before questioning began, Wilson went over defendant's constitutional rights using a standard form, and defendant signed the form. The first interview ended when defendant demanded an attorney. Defendant was transferred to another location for the night. The next day, Thomas and Detective Sergeant Kenneth Ducker arrived to transfer defendant back to the homicide unit for a buccal swab. According to Ducker and Thomas, during or just before transport, defendant said that he wanted to talk to the police. When they arrived at the homicide unit, Thomas reviewed defendant's constitutional rights, and defendant signed a second written acknowledgement form.

During the second interview, defendant admitted that Landers and Hunt came to his home after he initiated contact through Backpage.com. Defendant said when the women arrived, they smoked marijuana together, and he paid one of the women for sex. Defendant said he fell asleep, and when he woke up, he felt nauseous and found both of the women dead. Defendant admitted that he drove the women's car into his garage, loaded their bodies into the trunk, disposed of one of the women's clothing in the trash, then drove the car to the east side of Detroit and dropped it off near where he grew up. Defendant insisted that he did not kill the women, instead suggesting that the marijuana they smoked must have been tainted.

Defendant said that a few weeks later, he contacted McCrary through Backpage.com and McCrary and Curtis came to his home and they smoked marijuana together. Defendant said he fell asleep in his basement, and when he woke up, both of the women were dead. Defendant admitted that he put the women's bodies in the trunk of their car, drove into Detroit, poured

gasoline over the trunk and rear of the vehicle, and set it on fire with a lighter. Defendant said he disposed of the women's personal belongings in the trash at his home.

The case proceeded to trial in February 2014, and a jury found defendant guilty of all counts charged.

## II. VOLUNTARINESS OF INCRIMINATING STATEMENTS

Defendant first argues that his incriminating statements during the second interview on May 2, 2012, were involuntary under the totality of the circumstances. Below, defendant filed a motion to suppress his statements and requested a *Walker*[2] hearing. Defendant argued that the statements were involuntary because he was subject to seven hours of interrogation during a 48-hour period, he had no history of interacting with the police, the officers deceived him and promised that he would not be charged with homicide, and Thomas threatened to bring charges against defendant's mother. Following the *Walker* hearing, the trial court ruled that defendant's statements were voluntary under the totality of the circumstances.

We review de novo a trial court's determination that a defendant's incriminating statements were voluntary. *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010). However, we give great deference to a trial court's assessment of witness credibility and the weight given to evidence. *People v Sexton*, 461 Mich 746, 752; 609 NW2d 822 (2000). We review a trial court's factual findings for clear error and will not disturb the trial court's findings absent a definite and firm conviction that a mistake was made. *Gipson*, 287 Mich App at 264.

The United States and Michigan Constitutions prohibit compelled self-incrimination. US Const, Am V; Const 1963, art 1, § 17; *People v Elliott*, 494 Mich 292, 301 n 4; 833 NW2d 284 (2013). A prosecutor may not use a defendant's incriminating statements arising from a custodial interrogation unless he or she demonstrates that proper procedural safeguards were in place to protect the right against self-incrimination. See *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* A defendant may waive his rights if the waiver is voluntary, knowing, and intelligent. *Id.*

"[W]hether a waiver of *Miranda* rights is voluntary depends on the absence of police coercion." *People v Daoud*, 462 Mich 621, 635; 614 NW2d 152 (2000). The prosecution bears the burden of proving voluntariness by a preponderance of the evidence. *Id.* at 634. To determine whether a defendant's statement was voluntary, we consider the totality of the circumstances, including such factors as

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the

---

[2] *People v Walker (On Rehearing)*, 374 Mich 331, 338; 132 NW2d 87 (1965).

statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988).]

"[T]he voluntariness prong cannot be resolved in [a] defendant's favor absent evidence of police coercion or misconduct." *People v Howard*, 226 Mich App 528, 543; 575 NW2d 16 (1997). Ultimately, the test of voluntariness is whether a defendant's confession was the product of an essentially free and unconstrained choice or whether police misconduct overcame the defendant's will and critically impaired his capacity for self-determination. *People v Givans*, 227 Mich App 113, 121; 575 NW2d 84 (1997).

Defendant does not contest that his waiver was knowing and intelligent; thus, the only issue is whether defendant's statements were voluntary under the totality of the circumstances. At the time of the interrogation, defendant was a 24-year-old man with a high school diploma and a grade point average of 3.2. Although defendant did not have previous experience with the police, he testified that he went over the constitutional rights form, signed it, and understood what his rights were. In fact, defendant invoked his right to an attorney during the first interview. Defendant testified that he was not under the influence of drugs or alcohol at the time. He was subject to less than seven hours of interrogation over a 48-hour period, and did not appear to be lacking food, water, medication, or sleep. Officers ensured that defendant had his glasses on both days so he could see. Wilson got defendant a more comfortable chair when he realized he was a large man. Detective Sergeant Lil Drew testified that after defendant invoked his right to an attorney, he was allowed to call his mother.

Defendant argues that the interrogating officers made promises and assurances that they would help him if he made a statement. The record does not reflect the presence of such promises. During the first interview, Thomas stated the following:

James. James, listen to me. The tough way to say go ahead and do it. The result of me doing you is you're going away for the rest of your life, and never have a chance to tell me what it is I need to know to get you out of the mess. Because if you want to take the high road then rightfully so, we go ahead and charge you and send you on your way.

This statement is not a promise of leniency or a promise that Thomas would help defendant if he agreed to make a statement. This Court has held that a police officer telling a defendant that "he would do what he could to help and that things would go easier for defendant if he would cooperate and tell the truth" did not render subsequent incriminating statements involuntary. *People v Ewing (On Remand)*, 102 Mich App 81, 85-86; 300 NW2d 742 (1980).

Defendant argues that the officers induced him to make a statement by promising that he would not be charged with homicide. Before making his statement, defendant asked multiple questions about what charges would be brought against him. In response, the officers informed

-4-

defendant that they were not responsible for bringing the charges against him, and they did not know what the final charges would be. After defendant made his statement, the officers commented that they did not see murder from his description of events, but they also emphasized that they were not responsible for choosing the charges.

Defendant contends that the officers deceived him throughout the interviews. Although the officers said many untruthful things, including that they had video of defendant driving the women to Detroit, that they would not lie to defendant, that the interview was not being recorded, and that they believed defendant's description of the events, the mere fact that the police are untruthful during an interrogation does not render subsequent statements involuntary. *People v Hicks*, 185 Mich App 107, 113; 460 NW2d 569 (1990). It is not improper for the police to use psychological tactics when conducting an interrogation. *Haynes v Washington*, 373 US 503, 514-515; 83 S Ct 1336; 10 L Ed 2d 513 (1963).

Defendant asserts that he was coerced into making a statement because Thomas threatened to charge his mother. During the first interview, Thomas stated the following:

> Here is the funny thing. I don't know if this mean a lot to you, like it may mean to me but my mom means a lot to me. Do you know right now I can charge your mama right now. You know, right now your mama could be in custody in two or three minutes . . . [b]ecause it was her home.

> I'm talking to you man to man, cuz', do you understand that we are going to charge your mama with the same thing. You all be together.

Defendant then invoked his right to an attorney and the interview ended.

Defendant correctly points out that threats against an accused's family may render an incriminating statement involuntary.[3] Although Thomas's comments in this regard were not commendable, we conclude that they were not egregious enough to overcome the voluntariness of defendant's statements the next day. After Thomas made the comment about defendant's mother, defendant stated, "You all got to do what you got to do," and invoked his right to an attorney. Defendant chose *not* to make a statement as a direct result of Thomas's comment, instead choosing to invoke his rights and leave the interview. According to Ducker and Thomas, there were no additional comments about defendant's mother the next day before he offered to speak to the police. Rather, when asked why he wanted to make a statement, defendant affirmed that he simply wanted to get something off his chest.

---

[3] See *People v Richter*, 54 Mich App 598; 221 NW2d 429 (1974) (holding that a defendant's statement was involuntary when police threatened to permanently remove her daughter); see also *People v Robinson*, 386 Mich 551; 194 NW2d 709 (1972) (holding that a defendant's incriminating statement was involuntary where police denied the defendant medical treatment before the interrogation and insinuated that defendant's pregnant wife was in custody).

Defendant argues that his statements were involuntary because he was subject to continuing interrogation in a back room on May 1, 2012, after he invoked his right to an attorney. At the *Walker* hearing, Drew and Thomas both denied that defendant was interrogated in a back room after his first interview. When a factor affecting the voluntariness of an incriminating statement is dependent on the credibility of witnesses, we defer to the trial court's determination on the matter. *Sexton*, 461 Mich at 752. In this case, the trial court found that Drew's and Thomas's testimony was more credible on the issue of whether defendant was questioned in a back room after he invoked his right to an attorney.

Finally, defendant contends that Ducker's and Thomas's testimony was contradictory concerning when and how he offered to make a statement. At the *Walker* hearing, Thomas testified that as they were driving, defendant said, "Hey, I got to talk." Ducker testified that defendant said he wanted to talk when they were "[i]n the parking lot, walking to the car." At trial, Thomas testified that defendant said he wanted to talk as they "were exiting out of the Precinct and into the car." Later on, Thomas testified that defendant said he wanted to talk as they were getting into the car, but before he started driving. The relatively minor inconsistencies in the officers' testimony as to when defendant offered to talk do not appreciably undermine the trial court's conclusion that defendant voluntarily waived his *Miranda* rights. Under the totality of the circumstances presented above, the interrogating officers' conduct was not egregious enough to overcome defendant's will and self-determination.

## III. DISCOVERY OF PERSONNEL FILE

Defendant next argues that the trial court abused its discretion by refusing to order the release of personnel records. Before trial, defendant filed a motion for supplemental discovery, seeking to obtain Thomas's personnel file. The trial court denied defendant's motion, concluding that the file was not subject to mandatory disclosure under MCR 6.201, and defendant did not show good cause why the court should order release of the file.

We review a trial court's decision regarding discovery for an abuse of discretion. *People v Phillips*, 468 Mich 583, 587; 663 NW2d 463 (2003). An abuse of discretion occurs if the trial court's decision falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

"There is no general constitutional right to discovery in a criminal case." *People v Elston*, 462 Mich 751, 765; 614 NW2d 595 (2000). Rather, discovery in a criminal case is limited by the standards set forth in MCR 6.201. *People v Greenfield (On Reconsideration)*, 271 Mich App 442, 447; 722 NW2d 254 (2006). Unless the subject of discovery is set forth in the court rules or the party seeking discovery shows good cause, a trial court lacks authority to issue a discovery order in a criminal case. *Id.* at 448. Due process requires the prosecution to provide a defendant with any material exculpatory evidence in its possession. *Id.*; see also *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). This obligation extends to evidence that could be used to impeach a government witness. *United States v Bagley*, 473 US 667, 676; 105 S Ct 3375; 87 L Ed 2d 481 (1985). However, discovery will not be required if "the record reflects that the party seeking disclosure is on a fishing expedition to see what may turn up." *People v Stanaway*, 446 Mich 643, 680; 521 NW2d 557 (1994) (citation and quotation

marks omitted). The moving party bears the burden of showing that the requested information is necessary to prepare a defense and for a fair trial. *Id.*

Thomas's personnel file was not subject to mandatory disclosure under MCR 6.201(A) and was not exculpatory information or evidence known to the prosecuting attorney under MCR 6.201(B). Accordingly, defendant was required to show good cause why the trial court should order disclosure of the file. See *Greenfield*, 271 Mich App at 448; MCR 6.201(I). In the brief accompanying his motion for supplemental discovery, defendant argued that Thomas's personnel file should be disclosed because Thomas's son was involved in a school shooting case that was disposed of in a questionable manner, and because the file might contain impeachment evidence. At the hearing on the motion, defendant argued that Thomas allegedly provided a false affidavit in a federal lawsuit. Defendant's mere speculation that Thomas's personnel file might contain evidence of past discipline or untruthfulness was not a sufficient reason to require the trial court to order such discovery. Under these circumstances, the trial court did not abuse its discretion.

## IV. IMPEACHMENT EVIDENCE

Defendant contends that the trial court abused its discretion by preventing him from cross-examining Thomas at trial regarding past alleged incidents of filing false affidavits and using improper interrogation techniques in unrelated cases. The trial court concluded that there was a high probability that the evidence would mislead or confuse the jury, and that the evidence was cumulative because there were already inconsistencies in Thomas's testimony that defendant could use to diminish his credibility.

Generally, we review a trial court's decision regarding the admissibility of evidence for an abuse of discretion; however, where such a decision involves a preliminary question of law, it is reviewed de novo. *People v Dobek*, 274 Mich App 58, 85; 732 NW2d 546 (2007).

MRE 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In *People v Brownridge*, 459 Mich 456, 464-465; 591 NW2d 26 (1999), our Supreme Court held that a trial court did not abuse its discretion in refusing to admit evidence that a police officer made an allegedly false statement in an affidavit in an unrelated case because there was a high probability that the evidence would mislead the jury.

In this case, like in *Brownridge*, allowing in evidence concerning Thomas's alleged misconduct in unrelated cases would run a great risk of confusing the issues or misleading the jury. Moreover, as the trial court noted, the evidence was cumulative because the defense already had evidence to attack Thomas's credibility by comparing the inconsistencies in his statements at the pretrial hearings, the recorded interrogations, and at trial. Defendant also has not demonstrated that the evidence was "probative of truthfulness or untruthfulness" under MRE 608(b) because he failed to provide Thomas's allegedly false affidavits or testimony for review below or on appeal. Accordingly, the trial court did not abuse its discretion.

## V. DISCOVERY VIOLATION REMEDY

Defendant asserts that the trial court abused its discretion by refusing to exclude his text messages with Christina Morris. At trial, the prosecution sought to introduce Morris's cell phone data from December 17 and December 18, 2011. Defendant objected, contending that the prosecutor inadvertently failed to produce the data during discovery and that the evidence was irrelevant. The prosecutor argued that the data was relevant to show defendant's state of mind, and that it involved text messages and phone calls that defendant knew about, so the discovery oversight was not prejudicial. The trial court permitted admission of the data.

We review a trial court's imposition of a remedy in light of a discovery violation for an abuse of discretion. *People v Davie (After Remand)*, 225 Mich App 592, 597-598; 571 NW2d 229 (1997). We also review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Dobek*, 274 Mich App at 85.

Under MCR 6.201(J), if a party fails to comply with the discovery rules, the trial court has discretion to fashion a just remedy under the circumstances. When determining an appropriate remedy, "the trial court must balance the interests of the courts, the public, and the parties in light of all the relevant circumstances, including the reasons for noncompliance." *People v Banks*, 249 Mich App 247, 252; 642 NW2d 351 (2002). Exclusion as a remedy for a discovery violation is a severe sanction that is reserved for egregious cases. *Greenfield*, 271 Mich App at 454 n 10. A defendant is not entitled to a remedy for a prosecutor's nondisclosure of discoverable material if the defendant had knowledge of the material independent of discovery. *People v Taylor*, 159 Mich App 468, 487-488; 406 NW2d 859 (1987).

In this case, defendant was not entitled to a discovery remedy because he had personal knowledge of the cell phone data because he participated in each of the calls and text messages with Morris. Even if defendant was entitled to a remedy, given the inadvertence of the prosecutor's error, the fact that the prosecutor provided defendant with the data as soon as the oversight was discovered, and that defendant had personal knowledge of the data beforehand, this was not an egregious discovery violation warranting exclusion.

The evidence was also relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Defendant admitted that he disposed of Hunt's and Landers's bodies on the morning of December 18, 2011. The cell phone records between defendant and Morris revealed that defendant began texting Morris just hours after he disposed of Hunt's and Landers's bodies to solicit sexual services. This evidence was relevant to demonstrate defendant's state of mind because it suggests that he was not remorseful about the incident involving Hunt and Landers, and continued to intentionally seek out additional sexual encounters immediately after disposing of their bodies. The trial court did not abuse its discretion in refusing to exclude the evidence on relevancy grounds.

## VI. SUFFICIENCY OF THE EVIDENCE

Finally, defendant argues that insufficient evidence supported his convictions. At trial, defendant preserved his sufficiency claim with respect to the homicide charges by moving for a

directed verdict on these counts at the close of the prosecution's proofs. However, defendant did not challenge the sufficiency of the evidence regarding the other charges, rendering these issues unpreserved. We review challenges to the sufficiency of the evidence de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "Even though unpreserved, a question of sufficiency of evidence may be reviewed de novo by this Court in a criminal case." *People v Osby*, 291 Mich App 412, 415; 804 NW2d 903 (2011).

In reviewing a sufficiency claim, we view the evidence in a light most favorable to the prosecution to determine whether a rational jury could find that the essential elements of the charged crime were proven beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992). We will not interfere with a jury's determinations of credibility or weight of the evidence. *Id.* "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Allen*, 201 Mich App 98, 100; 505 NW2d 869 (1993). The prosecution need not negate every theory of innocence so long as it proves its own theory beyond a reasonable doubt "in the face of whatever contradictory evidence the defendant may provide." *People v Konrad*, 449 Mich 263, 273 n 6; 536 NW2d 517 (1995).[4]

In order to convict a defendant of first-degree murder, the prosecution must prove that "the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995). A jury may infer premeditation and deliberation from the circumstances surrounding the killing. *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993). "Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent to kill." *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008).

Sufficient evidence supported defendant's four convictions for first-degree murder at trial. Defendant admitted that he contacted Landers and Hunt through an ad on Backpage.com, and they were at his house on the night they died. Defendant stated that after they smoked marijuana, he had sex with one of the women, and they all fell asleep in his basement. Defendant said that when he woke up, both women were dead. Defendant admitted that he put the bodies in the trunk of their car, threw away one of the women's clothing, and drove the vehicle to Detroit where he dumped the bodies and the vehicle.

Defendant admitted that he contacted McCrary through Backpage.com, and McCrary and Curtis were at his home on the night they died. Defendant said that once the women arrived, they smoked marijuana in the garage then went into the basement where he fell asleep. Defendant said that when he woke up, both women were dead. He admitted that he put the

---

[4] Defendant argues that his statements from May 2, 2012, should not be used in assessing his sufficiency claim because the statements were involuntary. Defendant's statements were voluntary under the totality of the circumstances as discussed *supra*. Further, even if the statements were involuntary, when reviewing a sufficiency claim, courts consider all the evidence admitted at trial, even if the evidence was erroneously admitted. *McDaniel v Brown*, 558 US 120, 130; 130 S Ct 665; 175 L Ed 2d 582 (2010).

women's bodies in the trunk of their vehicle, drove into Detroit, poured gasoline over the trunk, and used a lighter to set the car on fire. Defendant said he disposed of the women's belongings in the garbage at his home.

At trial, Dr. Francis Diaz and Dr. Carl Schmidt, who performed the autopsies, testified that the four women did not die of natural causes, and that their manner of death was homicide. Although they could not determine a specific cause of death, Schmidt and Diaz both believed the women were asphyxiated. Defendant argued that the women died from the marijuana they smoked, and that he was not responsible for their deaths. However, Hunt's toxicology report indicated that she did not have marijuana in her system when she died, and Schmidt and Diaz both testified that none of the women had any poisonous or toxic substances in their systems that could have caused death.

Cell phone data confirmed that the women were with defendant when they died. The data also revealed that defendant was soliciting sexual services from Morris in the time around and shortly after defendant disposed of Hunt's and Landers's bodies. Only two weeks separated the incidents. Blood matching Curtis's DNA profile was discovered on a closet door in defendant's bedroom, and defendant could not be excluded from DNA samples under Hunt's and Landers's fingernails. Considering this evidence in a light most favorable to the prosecution, a rational jury could find beyond a reasonable doubt that defendant intentionally killed each of the four women, and that he did so with deliberation and premeditation.

Sufficient evidence also supported defendant's convictions for arson of real property and arson of personal property worth more than $1,000 but less than $20,000. Former MCL 750.73 states that a person who "willfully or maliciously burns any building or other real property" is guilty of a felony. Former MCL 750.74(1)(c)(*i*) states that any person who willfully or maliciously burns personal property worth more than $1,000 but less than $20,000 is also guilty of a felony. Defendant admitted that he drove McCrary and Curtis's vehicle to Detroit, poured gasoline on the trunk and rear of the vehicle, and set it on fire. The police found the vehicle, a 1997 Buick LaSabre, parked in a vacant garage, and both the vehicle and the garage were on fire. Richardson testified that he believed the fire was caused by human hands because there were no alternative electrical or mechanical sources. Considering that defendant parked the vehicle in a vacant garage, then admitted to pouring gasoline on the vehicle and setting it on fire, a reasonable jury could find beyond a reasonable doubt that defendant willfully and maliciously burned real property and personal property worth more than $1,000 but less than $20,000.

However, sufficient evidence did not support two of defendant's convictions for disinterment, mutilation, defacement, or carrying away of a human body under MCL 750.160. MCL 750.160 states the following:

> A person, not being lawfully authorized so to do, who shall wilfully dig up, disinter, remove, or convey away a human body, or the remains thereof, from the place where the body may be interred or deposited, or who shall knowingly aid in such disinterment, removal, or conveying away, or who shall mutilate, deface, remove, or carry away a portion of the dead body of a person . . . shall be guilty of a felony.

The evidence in this case does not establish that defendant dug up, disinterred, removed, or conveyed any of the women's bodies "from the place where the body may be *interred or deposited*." MCL 750.160 (emphasis added). The women's bodies had neither been interred nor deposited. They were in the place where they died when defendant moved them. Defendant also did not mutilate, deface, remove, or carry away *a portion of* Landers's or Hunt's dead bodies. Defendant stated that when he discovered Landers and Hunt were dead, he placed their bodies in the trunk of a car and drove the car to the east side of Detroit. Defendant did not remove or carry away a portion of their bodies, and he did not mutilate or deface their bodies in any way. Accordingly, insufficient evidence supported defendant's convictions under MCL 750.160 with respect to Landers and Hunt.

Regarding McCrary and Curtis, defendant stated that when he discovered they were dead, he placed their bodies in the trunk of a vehicle, drove the vehicle into Detroit, then poured gasoline over the trunk and rear of the vehicle and set it on fire. McCrary's and Curtis's bodies were both burned beyond recognition. Dr. Schmidt testified that although McCrary's and Curtis's extremities were mostly burned away, their internal organs were intact. Considering this evidence, a rational jury could conclude beyond a reasonable doubt that defendant mutilated or defaced a portion of McCrary's and Curtis's dead bodies in violation of MCL 750.160.

Affirmed with respect to all but two of defendant's convictions under MCL 750.160, which we reverse, and remanded to the trial court for amendment of the judgment of sentence to reflect that the two convictions under MCL 750.160 are vacated.

/s/ Michael F. Gadola
/s/ Kathleen Jansen
/s/ Jane M. Beckering

-11-