*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MUHAMMAD ALTANTAWI,

      Defendant-Appellant.

UNPUBLISHED
September 5, 2019

No. 346775
Oakland Circuit Court
LC No. 2017-265355-FJ

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

Defendant appeals by leave granted[1] the trial court's orders denying his motion to suppress the contents of a digital video recording (DVR) device and defendant's statements during his August 22, 2017 police interview. We affirm.

## I. BACKGROUND

This interlocutory appeal arises from the events concerning the death of defendant's mother, Nada Huranieh, which occurred on August 21, 2017. Huranieh was found dead at approximately 6:30 a.m., from an apparent fall from a second story window in a guest bedroom of the family home onto a patio. Huranieh and her three children, 16-year-old defendant, his nine-year-old sister SA, and his 14-year-old sister AA, were the only people in the house at the time of Huranieh's fall. Dr. Altantawi, Huranieh's husband and the children's father, did not live at the family home at the time and did not have keys to the house because he and Huranieh were going through a divorce.

After the fall, Farmington Hills police officers dispatched to the family home noticed the odd position of Huranieh's body on the patio, and the circumstances regarding the fall caused

---

[1] *People v Altantawi*, unpublished order of the Court of Appeals, entered March 7, 2019 (Docket No. 346775).

them to believe that Huranieh's fall may not have been accidental. When they arrived at the scene and walked around the exterior of the house, Detective Ryan Molloy and Sergeant Richard Wehby noticed several security cameras installed around the home's property. Inside the guest bedroom from which Huranieh fell, they found a ladder near the window and a bottle of Tilex, a cleaning solution but not a window spray. When Detective Molloy asked Dr. Altantawi whether the security cameras worked, Dr. Altantawi said that they did not. Defendant also told Detective Molloy that he did not think that the security cameras worked.

On August 22, 2017, Detective Molloy spoke with the interior decorator for the family home who stated that the security cameras at the house worked. Later that day, Detective Molloy and Detective Jason Hammond returned to the home to find the DVR and analyze its contents. When Detective Hammond knocked on the door, Dr. Altantawi answered and gave the police permission to look for the DVR. Dr. Altantawi and Detectives Molloy and Hammond unsuccessfully searched part of the house for the DVR. Eventually, after speaking with the interior designer and an employee from the security company that installed the security cameras, Dr. Altantawi and the detectives found the DVR in the furnace room adjacent to an exercise room. Detective Molloy asked Dr. Altantawi if the police could review the contents of the DVR and Dr. Altantawi agreed to permit them to take the DVR. The detective recorded that conversation.

The police took the DVR to the station, accessed its contents, and located video relevant to the time of Huranieh's fall. A camera captured video footage that showed a light on in the guest bedroom and shadows cast by the light. A camera recorded Huranieh's body from a different angle as it fell and landed on the ground. Footage showed that a shadow of a figure left the bedroom and after a few seconds the light in the guest bedroom turned off. The police reviewed the recorded video and discerned another person's presence in the guest bedroom when Huranieh's body fell out the window. The police officers testified that, on close examination, the footage depicted a person drag a body into the room and flip the body out of the window. The video showed movement in front of the window and a ladder being placed in front of the window from which Huranieh fell. Because Sergeant Wehby believed that a homicide had taken place inside the house, he instructed another police officer to start drafting a search warrant while he and Detectives Molloy and Hammond returned to the home. Sergeant Wehby initially wanted to have Dr. Altantawi take the children to the police station so that they could be interviewed. The police were unsure who may have been involved in Huranieh's death and inside the guest bedroom with Huranieh.

When Detective Molloy, Detective Hammond, and Sergeant Wehby arrived back at the family home, Dr. Altantawi invited them inside the house. The police asked him to take the children to the police station. Dr. Altantawi advised that he preferred that they speak with the children at the residence because they would be more comfortable at home. Sergeant Wehby and Detective Hammond accompanied Dr. Altantawi upstairs where they located defendant. Dr. Altantawi directed the police officers to a dining room table and prayed with defendant before leaving the house to pick up AA at the school library. After Dr. Altantawi left the house, defendant sat at the table with the police officers in the dining room, located in an open floor

plan with access to other areas including the kitchen and a living area. None of the police officers advised defendant of his *Miranda*[2] rights. The police officers started to review the timeline with defendant. The police did not restrict defendant's movements and he freely got up during the interview and used the restroom and also got himself a bottle of water. Sergeant Wehby encouraged defendant to be honest and suggested that defendant had been in the bedroom with Huranieh when she fell. Defendant eventually told the police officers that he held the ladder for Huranieh while she was cleaning a window, but failed to pay attention, which somehow caused her to fall. The police questioned defendant for approximately 40 minutes. Approximately 20 minutes later, the police arrested defendant and charged him with first-degree premeditated murder in violation of MCL 750.316(1)(a).

Defendant moved to suppress the DVR video and his statements to the police during the August 22, 2017 police interview. The trial court denied his motions following an evidentiary hearing. Defendant sought leave to appeal those decisions and this Court granted his application.

## II. STANDARD OF REVIEW

We review de novo the trial court's ruling on a motion to suppress evidence. *People v Woodard*, 321 Mich App 377, 383; 909 NW2d 299 (2017). The trial court's factual findings are reviewed for clear error. *Id.* at 382. We also review for clear error "[t]he trial court's decision regarding the validity of consent . . . ." *People v Mahdi*, 317 Mich App 446, 460; 894 NW2d 732 (2016) (quotation marks and citation omitted). Clear error exists when this Court is left with a definite and firm conviction that the trial court has made a mistake. *People v Barbarich*, 291 Mich App 468, 471; 807 NW2d 56 (2011).

## III. ANALYSIS

## A. THE DVR EVIDENCE

Defendant first argues that the trial court erred by denying his motion to suppress the DVR video because Dr. Altantawi did not voluntarily give the police his unequivocal consent to take the DVR. We disagree.

" 'The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures.' " *Woodard*, 321 Mich App at 383, quoting *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000), citing US Const, Am IV; Const 1963, art 1 § 11. A seizure of property within the meaning of the Fourth Amendment "occurs when there is some meaningful interference with an individual's possessory interests in that property." *Woodard*, 321 Mich App at 383 (citation and quotation marks omitted). Generally, a seizure conducted without a warrant is unreasonable per se. *Id.* However, "[c]onsent is an exception to the warrant requirement" and permits a warrantless seizure so long as the consent is "unequivocal, specific, and freely and intelligently given." *Mahdi*, 317 Mich App at 460 (citation omitted). "Whether consent to

---

[2] *Miranda v Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed2d 694 (1966).

search is freely and voluntarily given presents a question of fact that must be determined on the basis of the totality of the circumstances." *Id*. (citation omitted). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Id*. (quotation marks and citation omitted). When the prosecution seeks to rely upon consent to justify the lawfulness of a search, it must prove that the consent was, in fact, freely and voluntarily given. *People v Farrow*, 461 Mich 202, 208; 600 NW2d 634 (1999). The prosecution does not satisfy this burden by "showing no more than acquiescence to a claim of lawful authority." *Id*.

Only a person whose property is subject to a seizure or a third party who has common authority over the property can give the consent necessary to justify a seizure. *Lavigne*, 307 Mich App at 540, citing *People v Brown*, 279 Mich App 116, 131; 755 NW2d 664 (2008). "Common authority is based on mutual use of the property by persons generally having joint access or control for most purposes." *Brown*, 279 Mich App at 131 (citation and quotation marks omitted). As a preliminary matter, Dr. Altantawi possessed the authority to give the police consent to search the family home and take the DVR. Dr. Altantawi was the only living legal owner of the home at the time the police searched the house and took the DVR. Even if Dr. Altantawi was prohibited from entering the property, he still had a legal ownership interest in the property because he and Huranieh had not yet finalized their divorce. Therefore, Dr. Altantawi possessed the ability to give the police consent to search the house and take the DVR.

Defendant claims that the police used a tactical procedure known as "knock and talk," which is a tactic that the police employ for the purpose of investigating suspected wrongdoing. *Lavigne*, 307 Mich App at 538. The "knock and talk" procedure typically involves police who, having some knowledge that they believe justifies further investigation but is insufficient to constitute probable cause for a search warrant, approach an individual suspected of engaging in an illegal activity at the individual's residence, identify themselves as police officers, and ask for "consent to search for the suspected illegality or illicit items." *People v Frohriep*, 247 Mich App 692, 697; 637 NW2d 562 (2001).

In this case, the police suspected that something unusual occurred upon inspecting the position of Huranieh's body on the patio and the state of the guest bedroom where she fell out of the window. Officer Jordon and Detective Molloy both tried to find out whether the security cameras around the house worked and they desired to find out what the security camera footage contained. The record reflects that defendant, AA, and Dr. Altantawi said that they did not think the security cameras worked. After Detective Molloy spoke with the interior designer who reached out to the security company that installed the security cameras and confirmed that the cameras worked, he and Sergeant Wehby agreed that the police needed to investigate the security camera footage. When Detectives Hammond and Molloy went to the home to seek consent to search for the DVR, they had not yet sought a search warrant for the house. As soon as Dr. Altantawi opened the door for Detectives Hammond and Molloy, Detective Molloy told Dr. Altantawi that the police "had received some information that the surveillance system was possibly working" and that he wanted to see if cameras were working at the time of Huranieh's fall.

The record indicates that the police used the "knock and talk" procedure to further investigate possible criminality concerning Huranieh's death and that they lacked probable cause to obtain a warrant at that time. The practice of "knock and talk," however, does not automatically violate an individual's constitutional protections, though the "right to be free of unreasonable searches and seizures may be implicated where a person, under particular circumstances, does not feel free to leave or where consent to search is coerced." *Id.* at 698. The same general rules that govern police conduct are applied to the circumstances of the particular case whenever the "knock and talk" tactic is used. *Id.* at 698-699.

Detective Molloy testified that Dr. Altantawi allowed him and Detective Hammond inside his house to search for the DVR after they informed him that they believed the DVR to be operational. The record reflects that Dr. Altantawi did not know where the DVR had been installed in the house. After searching several parts of the house accompanied by Dr. Altantawi, Detective Molloy called the interior designer and the security company for information about the DVR's location. Once located, Detective Molloy began to record his conversation with Dr. Altantawi. The following exchange took place:

> *Detective Molloy*: You can understand that, right? So, what we want to do is, we want to, ah, just take that, take a look at it . . . either, ah, either have our guys take a look at it or some computer people so they can pull the information off of it and just make sure there's nothing on tape that's suspicious or anything like that.

> *Dr. Altantawi*: Yeah, but I mean, if we don't go by what the people, you know: he-said-she-said . . . .

> *Detective Molloy*: I know. And this is more . . . . Let's, let's make sure there's nothing on it and then just move on with anything. Okay? No problems with that?

> *Dr. Altantawi*: I mean I don't know. I don't think I have a problem with that. But, like I said, the whole thing is shocking to me. Again, you know . . . . The situation is bizarre.

> \* \* \*

> *Dr. Altantawi*: I know there was cameras, but I didn't know they were there.

> *Police Officer*: Okay. You don't mind if we take it in and take a look, though?

> *Dr. Altantawi*: So, I don't know.

> *Police Officer*: We'll get it back to you soon as we can.

> *Dr. Altantawi*: Mmmm. I mean, I guess I don't have any issue with that.

*Police Officer*: Okay. Alright. I appreciate it. We'll get it back to you when we can.

"Whether consent to search is freely and voluntarily given is a question of fact based on an assessment of the totality of the circumstances." *People v Borchard-Ruhland*, 460 Mich 278, 294; 597 NW2d 1 (1999) (citations omitted). "The presence of coercion or duress normally militates against a finding of voluntariness." *Id*. Knowing the right to deny consent, however, is not a necessary prerequisite for valid consent. *Id*.

In this case, evidence established that Dr. Altantawi knowingly and voluntarily invited the police officers into his home. The transcript of the audio recording of Dr. Altantawi's conversation with Detective Molloy establishes that Dr. Altantawi voluntarily consented to allow the police to take the DVR. The record reflects that the police never threatened Dr. Altantawi with arrest, caused him duress, or coerced his consent. Although the police did not advise Dr. Altantawi of his right to deny the police consent to take the DVR, knowledge of the right to deny the police consent is only one factor for consideration in determining whether he voluntarily gave his consent. *Id*. De novo review of the record indicates that Dr. Altantawi understood that he could have refused to allow the police to take the DVR, but he consented when the police specifically asked for his permission. Although he expressed reservation at first, he ultimately told the police that he did not "have any issue with" the police taking the DVR.

During the evidentiary hearing, Dr. Altantawi testified that Detectives Molloy and Hammond barged into his home and demanded to know the DVR's location. Dr. Altantawi also claimed that the recorded conversation took place after Detective Molloy unplugged the DVR and walked upstairs with it under his arm. Dr. Altantawi attempted to suggest that the police had already exercised control over the DVR before asking for consent to take it. Detective Molloy, however, testified that he obtained Dr. Altantawi's consent before unplugging the DVR. The issue of consent presents a question of fact and often involves credibility determinations. *People v Chowdhury*, 285 Mich App 509, 525; 775 NW2d 845 (2009). The trial court found that Dr. Altantawi's testimony lacked credibility and Detective Molloy's testimony was more credible. The audio recording and its transcript, and the testimony of witnesses at the evidentiary hearing, support the trial court's conclusion that Dr. Altantawi consented to the search of his home and that he consented to the police taking and investigating the contents of the DVR. The trial court, therefore, properly denied defendant's motion to suppress the contents of the DVR.

### B. DEFENDANT'S POLICE INTERVIEW

Defendant next argues that the trial court erred when it denied his motion to suppress his statements to the police during the August 22, 2017 police interview on the grounds that the police subjected him to a custodial interrogation that violated his Fifth Amendment rights because the police did not provide him a *Miranda* warning. We disagree.

Both the Fifth Amendment, US Const, Am V, and the Michigan Constitution, Const 1963, art 1, § 17, " 'protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.' " *People v Honeyman*, 215 Mich App 687, 694; 546 NW2d 719 (1996), quoting *People v Schollart*, 194 Mich App 158, 164; 485 NW2d 312 (1992), quoting *Miranda*, 384 US at 467. In *Miranda*, the United States

Supreme Court held that before a person may be subjected to a custodial interrogation, the person must be warned that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney either retained or appointed." *Miranda*, 384 US at 444. This Court reviews "the totality of the circumstances to determine whether a defendant was in custody at the time of the interrogation." *People v Cortez*, 299 Mich App 679, 691; 832 NW2d 1 (2013).

"[W]hether a person was 'in custody' for purposes of *Miranda* warnings is a mixed question of fact and law, which must be answered independently after review de novo of the record." *People v Barritt*, 325 Mich App 556, 561; 926 NW2d 811 (2018) (citation omitted). We review for clear error a trial court's factual findings concerning the circumstances regarding the statements that a defendant gave to the police. *Id*. A trial court's finding is clearly erroneous if, after reviewing the entire record, this Court "is left with a definite and firm conviction that a mistake has been made." *Id*.

Every citizen has a constitutional right against self-incrimination. *Id*., citing US Const, Am V; Const 1963, art 1, § 17. In *Barritt*, this Court explained:

> To effectuate this right, the police must warn a defendant of his or her constitutional rights if the defendant is taken into custody for interrogation. Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination. [Id. at 561-562 (citations omitted).]

When a defendant is taken into custody for interrogation, the police must provide a *Miranda* warning. *People v Cortez (On Remand)*, 299 Mich App 679, 691; 832 NW2d 1 (2013), quoting *Miranda*, 384 US at 444. *Miranda* warnings, however, are not required unless the questioning amounts to a custodial interrogation. *People v Steele*, 292 Mich App 308, 316; 806 NW2d 753 (2011). "Generally, a custodial interrogation is a questioning initiated by law enforcement officers after the accused has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." *Id*. (citations omitted). Whether a suspect is in custody depends on the totality of the circumstances with respect to the interrogation. *Barritt*, 325 Mich App at 561-562. Courts must "ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id*. (citations and quotation marks omitted). Factors that this Court must consider include: "(1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning." *Id*. at 562-563 (citations and quotation marks omitted).

In *Howes v Fields*, 565 US 499, 509; 132 S Ct 1181; 182 L Ed2d 17 (2012), the United States Supreme Court clarified that not

> all restrains on freedom of movement amount to custody for purposes of *Miranda*. We have declined to accord talismanic power to the freedom-of-movement inquiry, and have instead asked the additional question whether the relevant

environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. [Citation and quotation marks omitted.]

The Supreme Court explained that *Miranda* custody generally involved situations where persons have been cut off from normal life and abruptly transported into a "police-dominated atmosphere" where they may feel coerced into answering questions. *Id*. at 511 (citations omitted).

Interrogations conducted within a suspect's home are not per se custodial. *Beckwith v United States*, 425 US 341, 348; 96 S Ct 1612; 48 L Ed2d 1 (1976). A suspect is deemed to be "in custody" only when a reasonable person believes that he or she is not free to leave. See *Yarborough v Alvarado*, 541 US 652, 663; 124 S Ct 2140; 158 L Ed2d 938 (2004). In *Yarborough*, the United States Supreme Court held that when a minor is involved, the test is not whether a reasonable minor would believe he or she is free to leave, but whether a reasonable person would believe so. *Id*. at 667. A custodial interrogation occurs when a "police-dominated atmosphere" creates the "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *People v Elliott*, 494 Mich 292, 305; 833 NW2d 284 (2013) (quotations marks and citation omitted). A custodial interrogation can occur anywhere if it generates " '*that* sort of coercive environment to which *Miranda* by its terms was made applicable . . . .' " *Barritt*, 325 Mich App at 565, quoting *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714 (1977).

In this case, the record establishes that, after watching the security camera footage, the police desired to return to the family home and request that Dr. Altantawi take the children to the police station for questioning. The police arrived at the family home and Dr. Altantawi let them inside the house. The police informed him that they sought clarification on the timeline of events. Dr. Altantawi did not want the children to go to the police station to prevent their further traumatization following the death of their mother. He offered the police the opportunity to speak with the children at their home. The police entered the home and, although they were armed, they did not draw their weapons at any time. At around 3:30 p.m., shortly after the police arrived, Dr. Altantawi indicated that he needed to pick up AA from the school library. The police offered to do so, but he declined and went himself. Before leaving, he went upstairs to locate defendant. He permitted the police to accompany him. When they found defendant, he accompanied his father and the police downstairs. Before Dr. Altantawi left to pick up AA, the police inquired whether they could speak with defendant in his absence. Dr. Altantawi spoke with defendant who appeared to agree to speak with the police. Dr. Altantawi consented and permitted the police to remain at the home to speak with defendant.

Defendant and the police sat down at the table in the dining room which was open to other rooms in the house. The record reflects that the police did not command defendant to sit there or tell him that he could not leave. The police did not tell defendant that he had to answer their questions. Defendant never asked to terminate the interview or leave. Sergeant Wehby testified that during the interview defendant went to get himself a bottle of water and also went to use the restroom. The record reflects that the police did not restrict defendant's movements or restrain him in any way. The police did not arrest defendant or tell him that he was under arrest before the interview.

The recorded interview lasted approximately 40 minutes. The record does not indicate that the police subjected defendant to a coercive questioning environment. Rather, they asked questions and defendant freely responded to the police officers' questions that he felt like answering; and when he did not want to speak about a topic further, he told the police and stopped talking about it. The police did not attempt to force defendant to speak further on such topics. The police spoke in a reasonable tone and did not raise their voices. They expressed sensitivity to defendant when he expressed grief at losing his mother, while gradually explaining some of the events that took place preceding Huranieh's fall.

The record reflects that the trial court analyzed the totality of the circumstances and made findings consistent with the testimony of witnesses at the evidentiary hearing and the evidence presented to the trial court. The trial court listened to the recorded interview. The trial court found credible the police witnesses' testimonies which were consistent with the recorded interview. The trial court found that Dr. Altantawi's testimony lacked credibility because of noteworthy discrepancies between his description of events and the recorded interview. The trial court found that Dr. Altantawi fabricated some facts and exaggerated others. The evidentiary record supports the trial court's findings.

The recorded interview indicates that the police suggested to defendant that Huranieh may not have accidentally fallen on her own. Defendant initially denied that he was in the guest bedroom with Huranieh, but he offered contradictory facts and gradually changed his story. Defendant eventually told the police that he was in the guest bedroom when Huranieh fell out the window. He stated that he held the ladder for Huranieh while she cleaned a window but she fell.

The record does not establish that the police pressured defendant or hindered his ability to act under his own volition. The record reflects that the police discontinued the interview at Dr. Altantawi's request. The police did not arrest defendant until later. Sergeant Wehby called for a uniformed police officer to transport defendant to the police station. Approximately 20 minutes later, the uniformed police officer arrived at the family home to arrest defendant and transport him to the police department.

Under the totality of these circumstances, we cannot conclude that a reasonable person would not have felt at liberty to discontinue the interview and leave. *Yarborough*, 541 U.S. at 663. De novo review of the entire record in this case establishes that the police did not place defendant in a custodial environment and subject him to a custodial interrogation within the

meaning of *Miranda*.[3]  Therefore, the trial court did not err by denying defendant's motion to suppress his statements made during the August 22, 2017 police interview.

Affirmed.

/s/ Michael F. Gadola
/s/ James Robert Redford

---

[3] We acknowledge our dissenting colleague's citation to and reliance on *JDB v North Carolina*, 564 US 261; 131 S Ct 2394; 180 L Ed 2d 310 (2011).  In *JDB*, the Supreme Court remanded the case for a determination of whether or not JDB was in custody at the time he made his inculpatory statement.  At the time he made his statement, JDB was a 13-year-old seventh grader, taken by a uniformed officer from his social studies class and escorted to a conference room.  While in the closed conference room, he was questioned for 30 to 45 minutes by two police officers and two administrators.  He was not given the opportunity to speak to his grandmother before he was questioned.

In *JDB*, the Court wrote:  "The question remains whether J.D.B. was in custody when police interrogated him.  We remand for the state courts to address that question, this time taking account of all of the relevant circumstances of the interrogation, including J.D.B.'s age at the time." *Id*. at 281.

In the instant case, taking into account all the evidence of record, including the age of defendant, we believe defendant was not in a custodial environment when he met with law enforcement officers in the dining room of his home.