*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

MATTHEW LEWINSKI,

        Defendant-Appellee.

FOR PUBLICATION
October 28, 2024
12:29 PM

No. 365350
Macomb Circuit Court
LC No. 2022-001230-FC

Before: RIORDAN, P.J., and YOUNG and WALLACE, JJ.

PER CURIAM.

In this interlocutory appeal, the prosecution appeals as on leave granted[1] the order granting defendant's motion to suppress evidence of statements made to law enforcement officers. We reverse the order of the trial court and remand for proceedings consistent with this opinion.

This case arises from an incident where the body of Courtney Winters, the victim, was discovered in the basement of the condominium in which defendant resided. Defendant was charged with first-degree premeditated murder, MCL 750.316, disinterment and mutilation of a dead body, MCL 750.160, and concealing the death of an individual, MCL 333.2841(3). In July 2022, defendant filed a motion to suppress his statements made to the police during their interrogation of him at the hospital. Defendant argued that the detectives' questioning of him at the hospital was a custodial interrogation, and defendant was not free to leave. Defendant further

---

[1] See *People v Lewinski*, ___ Mich ___ (2024) (Docket No. 365350). Defendant originally sought leave to appeal in this Court and leave was denied. See *People v Lewinski*, unpublished order of the Court of Appeals, entered April 26, 2023 (Docket No. 365350). The Supreme Court thereafter remanded the case to this Court for consideration as on leave granted. *Lewinski*, ___ Mich at ___. The Prosecuting Attorneys Association of Michigan also appear as amicus curiae on appeal.

argued he was not advised of his *Miranda*[2] warnings at the beginning of the interrogation, and therefore, his incriminating statements must be suppressed.

A *Walker*[3] hearing for this matter was held in the trial court in November 2022. Clinton Township Police Department Detective Michael Chirco testified that, on July 26, 2021, defendant's neighbors called the police to report that defendant was "wandering the condominium complex only clothed in his underwear and he seemed to be mumbling or incoherent . . . ." Police were dispatched to defendant's address, defendant was then taken to Henry Ford Macomb Hospital for an evaluation, and he was admitted to the intensive care unit (ICU). While defendant was in the hospital, his sister went into defendant's condominium and discovered Winters's body in the basement. On July 28, 2021, Detective Chirco and his partner Detective Joseph Burns went to the hospital to interview defendant.

Detective Chirco noted that defendant was not restrained during the interview; however, defendant was receiving IV fluids and was connected to several medical machines. Detective Chirco also testified that defendant did not have "difficulty in processing thoughts or formulating words," he did not appear to be under the influence of drugs, and he "appeared calm and lucid." At the end of the interview, Detective Chirco told defendant that he would be taken into custody after his treatment concluded. Detective Chirco confirmed that he did not advise defendant at the outset of the interview that defendant was not required to speak to the detectives nor that defendant was free to leave. After about 20 minutes into the interview, Detective Burns left the hospital room to call Assistant Prosecutor Steven Fox. Fox instructed Detective Burns to advise defendant of his *Miranda* rights, which he did after returning to defendant's hospital room (defendant was advised of his *Miranda* rights approximately 40 minutes into the interview). Defendant was "very cooperative" and continued to talk to the detectives after he signed the waiver form. Defendant never invoked his right to remain silent, nor did he ever refuse to answer any questions.

Detective Chirco recorded the interview with defendant with a portable video camera. In the video, Detectives Chirco and Burns entered defendant's hospital room and woke defendant, who was sleeping. Detective Chirco introduced himself and Detective Burns as detectives from the Clinton Township Police Department and asked defendant if he minded if they talked to him for a few minutes and defendant was agreeable. Both detectives stood at the end of defendant's hospital bed, one on each side. Detective Burns stood between defendant's bed and the door. The video also shows a view of defendant lying in a hospital bed, wearing a hospital gown, with at least one IV bag connected to his arm and an oxygen tube near his head. Defendant was hooked up to several medical machines and monitors. Detective Chirco then asked basic questions about where defendant lived, for how long, and with whom he lived. Defendant stated that Winters had moved in with him in 2018. Defendant was then asked if Winters was still residing at the house, and defendant responded, "No, no. [A pause.] Obviously you guys found . . . yeah." Defendant stated what had happened was not his intent and subsequently said he was aware that he would get into trouble "for this."

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[3] *People v Walker*, 374 Mich 331; 132 NW2d 87 (1965).

Defendant stated Winters had told him she had been pregnant, but then later told him that she had aborted the fetus. Defendant admitted to restraining Winters and slapping her "across her face." Defendant then "put [his] hands on her throat" for about five minutes. Defendant also admitted that Winters had stopped moving at one point and that he moved her body to the bathroom. When asked if he had made any attempt to revive her, defendant responded, "No, it was clear that she was gone." Defendant then admitted he had kept Winters' body in the bathtub for approximately one month before he moved her body to the basement where it was colder. Detective Burns then excused himself from the conversation and left the room.

Detective Burns returned, approximately 27 minutes into the questioning, and stated, "Fox said *Miranda*." Detective Chirco told defendant he was not free to leave and defendant said, "right, of course." Detective Chirco then told defendant he was under arrest. Questioning was then paused for approximately 13 minutes while one of the officers retrieved a *Miranda* form. Approximately 40 minutes into the interview, the detectives read the *Miranda* form to defendant and discussed defendant's *Miranda* rights. Defendant signed the form and agreed to continue answering questions. Detective Chirco then proceeded with the interview and continued to question defendant about Winters' body. Defendant repeated the statements he made previously in the interview. The questioning lasted an hour and nine minutes in total (including the 13-minute pause).

The trial court granted defendant's motion to suppress in February 2023. The court reviewed the relevant factors concerning custodial interrogations outlined in *People v Barritt*, 325 Mich App 556, 562-580; 926 NW2d 811 (2018), to determine whether a reasonable person in defendant's position would have felt free to terminate the interrogation and leave. The court first noted that defendant had been connected to medical machines during the questioning, and thus had been physically restrained. Further, both detectives had been standing on both sides at the foot of defendant's bed. Neither detective told defendant he was free to leave, and they encouraged defendant to continue talking after he made incriminating statements. At the end of the questioning, defendant was arrested. Detective Burns was told by Fox that defendant needed to be advised of his *Miranda* rights during the questioning. Thus, the court concluded that, pursuant to *Barritt*, defendant was in custody at the time of his interrogation, and "the environment defendant was questioned in presented the same coercive pressures as . . . in *Miranda*." Further, because defendant's post-*Miranda* statements were "nearly continuous and clearly a product of the invalid pre-warning statements," both the pre- and post-*Miranda* statements must be suppressed.

On appeal, the prosecution argues the trial court erred when it suppressed voluntary statements made by defendant that were not gained in violation of *Miranda*. We agree.

"This Court's review of a lower court's factual findings in a suppression hearing is limited to clear error, and those findings will be affirmed unless we are left with a definite and firm conviction that a mistake was made." *People v Simmons*, 316 Mich App 322, 325; 894 NW2d 86 (2016) (quotation marks and citation omitted). Thus, "[t]he trial judge's resolution of a factual issue is entitled to deference" on review of a motion to suppress. *People v Farrow*, 461 Mich 202, 209; 600 NW2d 634 (1999)(citation omitted). This Court reviews the trial court's findings of fact for clear error, but reviews de novo the trial court's application of the law and "ultimate decision on a motion to suppress." *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009).

Additionally, this Court "review[s] de novo the question whether [a] defendant was in custody at the time he made the statements at issue" to the police. *People v Steele*, 292 Mich App 308, 316; 806 NW2d 753 (2011).

"Every person has a constitutional right against self-incrimination." *Barritt*, 325 Mich App at 561. "To protect a defendant's Fifth Amendment privilege against self-incrimination, custodial interrogation must be preceded by advice to the accused that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *People v Cortez*, 299 Mich App 679, 691; 832 NW2d 1 (2013) (quotation marks and citation omitted). "Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination." *Barritt*, 325 Mich App at 561-562.

" '[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *People v Elliott*, 494 Mich 292, 307; 833 NW2d 284 (2013) (quotation marks and citation omitted). The determination whether a person is considered to be "in-custody" with respect to an interrogation is a two-part inquiry, focusing on the freedom of movement and the environment. The first step is to "ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id*. (quotation marks and citation omitted). Further, "in order to determine how a suspect would have gauged his or her freedom of movement, courts must examine all of the circumstances surrounding the interrogation." *Barritt*, 325 Mich App at 562 (quotation marks, brackets, ellipses, and citation omitted). The relevant factors to consider include: "(1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning." *Id*. at 562-563 (citations omitted). "[N]o one circumstance is controlling; rather, a reviewing Court must consider the totality of the circumstances when deciding whether an individual was subjected to custodial interrogation under *Miranda*." *Id.* at 563.

We conclude the trial court correctly determined that a reasonable individual in the circumstances surrounding defendant's interrogation would not have felt free to leave or terminate the interview; however, as articulated below, we find that the environment of the interrogation was not unduly coercive pursuant to *Barritt*. Regarding the factor of location, defendant was questioned in a hospital ICU room. Defendant was asleep when the detectives first entered the hospital room and was hooked up to multiple medical monitors and machines. Detectives Chirco and Burns stood at the end of defendant's bed on either side, and Detective Burns stood between defendant's bed and the door. Although the police questioning occurred in a hospital room, not a police station, and the police did not take defendant to the hospital, we conclude that this is a neutral factor because the detectives were standing in a location that effectively blocked defendant's exit and defendant was actively being treated in the hospital which placed him in a more compromised and vulnerable state so that he more than likely would not have felt free to leave or terminate the interview.

Regarding the factor of duration, this Court has held that a 90-minute interview was a "neutral factor in making a custody determination." *Id*. at 569. Conversely, this Court has held

that "a half-hour interview did not constitute a custodial interrogation." *Id*. Thus, we conclude that the interview's 69-minute duration in this case is a neutral factor.

Regarding statements made during the interview, "failure to tell a suspect that he or she is free to leave is one factor that can contribute to a finding that a suspect was in custody." *Id*. at 570. If "an officer did not tell [the] defendant that he was free to leave . . . , [this fact] weigh[s] in favor of the view that [the] defendant was in custody." *Id*. (quotation marks and citation omitted). Here, the detectives never told defendant that he was free to leave. Additionally, defendant made incriminating statements less than three minutes into the interview; however, the detectives nevertheless continued to ask him questions for another 24 minutes before the interrogation was paused about 13 minutes (so that an officer could retrieve the *Miranda* form), after which *Miranda* warnings were given. Thus, we conclude this factor weighs in favor of finding that defendant would not have felt free to leave or terminate the interview.

Regarding the presence or absence of physical restraints during the questioning, "[g]enerally, the lack of handcuffs weighs against a finding of custody." *Id*. at 575. However, other forms of restraint may support a finding of custody. In *Barritt*, the Court concluded that the defendant being in the presence of an armed officer and being escorted to the police station by multiple officers were forms of restraint. *Id*. Here, although defendant was never handcuffed during the interview, he was lying in a hospital bed receiving intravenous fluids while hooked up to various medical devices. He had been undergoing treatment in the ICU of the hospital for a couple of days and had yet to be moved from that intensive care unit. Both detectives stood at the end of defendant's hospital bed, and Detective Burns stood directly between defendant and the door. Additionally, both detectives were armed while in defendant's hospital room. We conclude that, even though he was not handcuffed, defendant could not get out of bed and leave the hospital but, more importantly, it is not likely that the detectives would have allowed defendant to get out of bed and leave the hospital, i.e., defendant would have been restrained at such an attempt. In other words, restraints were not necessary because of defendant's debilitated physical condition—he was effectively incapacitated—at the time of questioning, but restraints would have been used if they became necessary. Thus, this factor weighs in favor of a finding that defendant would not have felt free to leave or terminate the interview.

Regarding release of the interviewee at the end of the questioning, this Court has held that "the fact that [a] defendant was allowed to leave the police station at the end of [an] interview" supported a "conclu[sion] that the defendant had not been in custody." *Id*. at 578. Here, defendant was arrested about 27 minutes into questioning and was not released at the end of the interview. We conclude this factor likewise weighs in favor of defendant being in custody.

Finally, regarding the issue of whether or not a reasonable person would believe he or she was free to leave or terminate the interview, defendant points to the following preliminary examination testimony of Detective Chirco:

> Q.     And at what point did that happen in the interview when you made the decision that this person was no longer free to leave?

A. He detailed the relationship that he had with Courtney Winters and that she had returned to - - the length of the relationship. That it had ended around November of 2020. But then she had returned just before Christmas of that year.

Defendant informed the officers that the victim had returned just before Christmas very early in the interview, around the two-minute mark, meaning Detective Chirco decided he was not free to leave just two minutes into the interrogation. Detective Chirco then continued to question defendant for about 25 additional minutes before pausing to obtain a *Miranda* form. However, because defendant did not know that Detective Chirco had decided he was no longer free to leave two minutes into the interrogation, this testimony by Detective Chirco is not relevant to the issue of whether a reasonable person in defendant's situation would believe they were free to leave or terminate the interview.

Next, we turn to the second consideration in our determination whether defendant was "in-custody" for purposes of deciding whether he was subjected to custodial interrogation under *Miranda*. "As our Supreme Court and the United States Supreme Court have stated, determining whether an individual's freedom of movement was curtailed is the first step in the analysis, not the last." *Id*. at 580. A court must also consider "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*. at 581.

> This point is best illustrated by the Supreme Court's ruling in *Berkemer* [*v McCarty*], 468 U.S. 420 [104 S Ct 3138; 82 L Ed 2d 317 (1984)]. In *Berkemer*, the Supreme Court held that the roadside questioning of a motorist who was pulled over in a routine traffic stop did not constitute custodial interrogation. *Id*. at 423, 441-442, 104 S.Ct. 3138. The Supreme Court held "that 'a traffic stop significantly curtails the "freedom of action" of the driver and the passengers,' and that it is generally 'a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission.' " *Fields*, 565 U.S. at 510, 132 S.Ct. 1181, quoting *Berkemer*, 468 U.S. at 436. "[F]ew motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Berkemer*, 468 U.S. at 436, 104 S.Ct. 3138. Nevertheless, the Supreme Court held that a person detained as a result of a traffic stop is not in *Miranda* custody because such detention does not "sufficiently impair [the detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id*. at 437, 104 S.Ct. 3138. Hence, the temporary and what the Supreme Court characterized as "relatively nonthreatening" detention that follows a *Terry* stop was insufficient for a finding of custody under *Miranda*. *Id*. What follows then is the idea that not all restraints on an individual's freedom of movement are tantamount to custody for purposes of deciding whether a person has been subjected to custodial interrogation under *Miranda*. [*Id*. at 580-581.]

In *Barritt*, the Court concluded the defendant's questioning took place in an unduly coercive environment. *Id*. at 582-584. The Court reasoned that there was "never a time when [the] defendant was not being watched by an armed police officer." *Id*. at 583. The defendant also "did

not get to arrange the time of the interview, the place of the interview, or when the interview would conclude." *Id*. At the end of the interview, "[the] defendant was handcuffed and placed in [a] police vehicle." *Id*. The Court concluded, "[the] defendant was never 'free' to any significant degree. Rather, his freedom of movement, along with his choices, had been taken from him by the police" at the time of the interview. *Id*.

Here, defendant likewise did not get to choose the time, place, or length of the interview. Defendant had been admitted to the hospital and was undergoing treatment; at the time of the interview, he had been connected to an IV bag and oxygen tube. Thus, defendant ostensibly could not have left the hospital or changed the location of the questioning. When the officers arrived, defendant was sleeping and had to be woken up by the officers. Additionally, the interviewing officers were armed, and there was never a time when defendant was not being watched by them. Defendant was then arrested at the end of the interview.[4]

However, there were additional coercive factors present in *Barritt* that do not exist in the present case. The facts in *Barritt* included the following:

> Defendant was on his front lawn when he was told by the police to get into the back of a police car. Defendant's dog had been forcibly removed from the home by animal-control officers, and he had no idea where the dog had been taken or how he would be able to secure the dog's return. He was not able to drive to the police station in the same car that brought him to the house, despite the fact that the police had told defendant's driver to drive to the very same police station. When the police car stopped, testimony indicated that armed detectives led defendant from the police car into the police station.
>
> * * *
>
> Defendant was not initially told he could leave or terminate the interview. Within a short time of being told he could end the interview at any time, defendant was handcuffed and placed inside another police vehicle for transportation to a different police station. The interview became increasingly accusatory as the detectives asserted that defendant was lying and that he did not tell them everything that he knew. The detectives asked defendant if he would pass a lie detector test, a statement indicative of psychological intimidation. An additional canine officer

---

[4] Amicus cites to *People v Kulpinski*, 243 Mich App 8; 620 NW2d 537 (2000), in which the court held the fact that the defendant was on a cot [in a hospital] wearing a neck brace when briefly spoken to by a police officer does "not constitute the significant type of restraint required to render him 'in custody' for purposes of *Miranda* warnings." *Id*. at 25, citing *People v Peerenboom* 224 Mich App 195, 197-198, 568 NW2d 153 (1997). However, this case is distinguishable from *Kulpinski*, which involved only one question posed to the defendant with no indications that he was hooked up to an IV or monitoring devices that would have restricted his movement in a way similar to defendant in the present case. There was likewise no indication that an officer blocked his exit during extensive questioning (the opinion in *Kulpinski* does not even say where the cot was located).

entered the room, again appealed to defendant's sense of honesty, and encouraged him to tell the truth. Taken together, these facts indicate a coercive environment. [*Id*. at 582-583.]

Unlike in *Barritt*, there was no time when the questioning in the present case could be described as accusatory. The officers never accused defendant of lying and never accused him of not telling them everything that he knew. The officers also never asked defendant if he would pass a lie detector test, i.e., unlike the defendant in *Barritt*, defendant was never confronted with that psychological intimidation tactic. The interrogation began with Detective Chirco introducing himself and Detective Burns, and asking if defendant would mind if they talked to him. Defendant's response was, "Of course, of course." The portion of the interrogation in which defendant admitted to killing the victim started only about 12 minutes into the interview, at which time defendant had been describing a physical confrontation that allegedly took place between he and the victim – he said they had both slapped one another. Detective Burns then asked, "So then what happens from there?" Defendant's response was, "I did it. I put my hands on her throat." About two minutes later, Detective Chirco asked how long he had his hand on her neck and defendant said, "Five minutes, maybe." Around the 16-minute mark, Detective Chirco asked defendant, "at some point did you realize that she was not moving anymore?" Defendant said yes and said he then moved her to the upstairs bathroom. Around the 17-minute mark, Detective Burns asked whether defendant attempted to revive the victim after he took her to the bathroom. Defendant's response was no, and said it was clear that she was gone. Even before the defendant explicitly described choking the victim to death, he made several unprompted admissions, such as suggesting that the officers had obviously found something (which appeared to be a reference to the victim's body), saying that he did not intend for what happened to actually happen, and acknowledging that he was in a lot of trouble. Most of the questions posed to defendant by Detective Burns and Detective Chirco were open ended and often consisted of simply asking him to tell them what happened next, i.e., they were not accusatory, hostile, or intimidating.

In addition, unlike in *Barritt*, defendant was never placed in a police car or taken to a police station during the interrogation.[5] Finally, whereas the court in *Barritt* found that the forcible removal of the defendant's dog contributed to the coercive environment, there was no similar action taken by the officers in the present case, i.e., they did not take anything from defendant before or during the interview.[6]

The trial court correctly noted that, at one point during the interrogation, defendant intensely held onto the rails of his hospital bed, asked if they could take a minute, and said he was making himself shake. However, we note that this sequence of events did not occur until after the

---

[5] We note that *Miranda* does not require that a person be placed in a police car or taken to a police station before their rights under *Miranda* are considered, but the fact that the defendant in *Barritt* was placed in a police car and taken to a police station must be considered when deciding whether the coercive environment in *Barritt* is comparable to the environment in the present case.

[6] In *Barritt*, the defendant's dog had been removed by animal control officers, "and he had no idea where the dog had been taken or how he would be able to secure the dog's return." *Id*. at 582.

pre-*Miranda* interrogation was completed, meaning it occurred after defendant had already said, *inter alia*, that he had choked the victim until she was unresponsive, that he did not attempt to revive her because she was gone, and that he had left her body in a bathroom tub for two months. The moment when defendant first grabbed onto the left and right bed rails actually began during the thirteen-minute pause in the interrogation, at which time defendant was not even being asked any questions. Defendant asked to "take a minute," and said he was making himself shake, after the 52-minute mark, i.e., about 12 minutes after he was issued the *Miranda* warnings and signed the *Miranda* form.

Therefore, considering the totality of the circumstances, we find that the pre-*Miranda* interrogation in the present case did not take place in an unduly coercive environment. As a result, pursuant to *Barritt*, we conclude that defendant was not in custody at the time of the pre-*Miranda* interrogation, and consequently, defendant's incriminating statements were not gained in violation of his *Miranda* rights.

The prosecution has argued in this case, that even if this Court held that defendant had been in custody prior to being provided with *Miranda* warnings, the confession that he made after receiving *Miranda* warnings would still be admissible because those statements were made after he was advised of his rights. Because we have found that defendant was not in custody prior to the time he received *Miranda* warnings, we need not decide that issue.[7]

We reverse the trial court's order suppressing statements made by defendant to law enforcement officers, and remand this matter to the trial court for proceedings consistent with this opinion.

Reversed and remanded. We do not retain jurisdiction.

/s/ Adrienne N. Young
/s/ Randy J. Wallace

---

[7] We note, however, that there is a lack of agreement as to the admissibility of statements obtained through this "two-stage interrogation" practice, i.e., interviews that occur before *Miranda* warnings and after *Miranda* warnings, as discussed in the plurality and Justice Kennedy's concurring opinions issued in *Missouri v Seibert*, 542 US 600; 124 S Ct 2601; 159 L Ed 2d 643 (2004). And there is no Michigan precedent on this issue.